[Nos. G039916, G040330. Fourth Dist., Div. Three. Jan. 29, 2010.]

CHRISTOS CATSOURAS et al., Plaintiffs and Appellants, v.
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL et al., Defendants
and Respondents.

The page shows a page number "861" at the top right, and the rest of the content is entirely redacted (black bars). There is no readable body text.

The "861" appears to be a page number in the header.The entire page content is redacted.

862

---

**COUNSEL**

Bremer, Whyte, Brown & O'Meara, Keith G. Bremer, Tyler D. Offenhauser; and Everett L. Skillman for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, James Humes, Chief Assistant Attorney General, James M. Schiavenza, Assistant Attorney General, Joel A.

Davis, Theodore B. Zinger and Elizabeth S. Angres, Deputy Attorneys General, for Defendant and Respondent Department of the California Highway Patrol.

Schlueter & Schlueter and Jon R. Schlueter for Defendant and Respondent Aaron Reich.

R. Rex Parris Law Firm, R. Rex Parris, Alexander R. Wheeler and Jason P. Fowler for Defendant and Respondent Thomas O'Donnell.

## OPINION

**MOORE, J.**—Nicole Catsouras (*decedent*) suffered a tragic end to her young life. At age 18, she was decapitated in an automobile accident. With her demise, the torment of her family members began. They endured not only her death, and the hideous manner of it, but also the unthinkable exploitation of the photographs of her decapitated remains. Those photographs were strewn about the Internet and spit back at the family members, accompanied by hateful messages.

In a second amended complaint against the Department of the California Highway Patrol (CHP) and two of its peace officers, Thomas O'Donnell (O'Donnell) and Aaron Reich (Reich), decedent's father, mother and sisters (plaintiffs) alleged that O'Donnell and Reich had e-mailed the horrific photographs of decedent's mutilated corpse to members of the public unrelated to the accident investigation. Plaintiffs alleged more specifically, in their opposition to a demurrer, that O'Donnell and Reich had e-mailed nine gruesome death images to their friends and family members on Halloween—for pure shock value. Once received, the photographs were forwarded to others, and thus spread across the Internet like a malignant firestorm, popping up in thousands of Web sites. Plaintiffs further alleged that Internet users at large then taunted them with the photographs, in deplorable ways.

The trial court, finding no duty on behalf of O'Donnell and Reich running in favor of plaintiffs, and no basis for a title 42 United States Code section 1983 (section 1983) cause of action, sustained demurrers without leave to amend as to O'Donnell and Reich. It thereafter entered judgments of dismissal as to them and a judgment on the pleadings in favor of the CHP. We reverse.

California law clearly provides that surviving family members have no right of privacy in the context of written media discussing, or pictorial media portraying, the life of a decedent. Any cause of action for invasion of privacy

in that context belongs to the decedent and expires along with him or her. (*Flynn v. Higham* (1983) 149 Cal.App.3d 677 [197 Cal.Rptr. 145] (*Flynn*).) The publication of death images is another matter, however. How can a decedent be injured in his or her privacy by the publication of death images, which only come into being once the decedent has passed on? The dissemination of death images can only affect the living. As cases from other jurisdictions make plain, family members have a common law privacy right in the death images of a decedent, subject to certain limitations. The court erred in sustaining the demurrers of O'Donnell and Reich as to the invasion ·of privacy cause of action.

In addition, the court erred in sustaining the demurrers as to the cause of action for intentional infliction of emotional distress. In their second amended complaint, plaintiffs alleged both that O'Donnell and Reich had acted with the intent to cause them emotional distress and that they had acted with reckless disregard of the probability of causing them emotional distress. The first of these allegations is sufficient to withstand a demurrer.

■ We also disagree that plaintiffs have no cause of action for negligence, supporting emotional distress damages. Applying the time-tested factors enunciated in *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*) (the *Rowland* factors), we conclude that the CHP and its officers owed plaintiffs a duty of care not to place decedent's death images on the Internet for the purposes of vulgar spectacle. In reaching this conclusion, we find three of the *Rowland* factors to be particularly important in this case: foreseeability, moral blame, and the prevention of future harm. It was perfectly foreseeable that the public dissemination, via the Internet, of photographs of the decapitated remains of a teenage girl would cause devastating trauma to the parents and siblings of that girl. Moreover, the alleged acts were morally deficient. We rely upon the CHP to protect and serve the public. It is antithetical to that expectation for CHP officers to inflict harm upon us by making the ravaged remains of our loved ones the subjects of Internet sensationalism. It is important to prevent future harm to other families by encouraging the CHP to establish and enforce adequate and effective policies to preclude its officers from engaging in such acts ever again.

We note that we do not have at issue here the freedom of the press. We address only the duties of CHP officers. The CHP here undertook to perform an investigation and to collect evidence. It was not in furtherance of the investigation, the preservation of evidence, or any other law enforcement purpose, to deliberately make a mutilated corpse the subject of lurid gossip. We determine the existence of duty on a case-by-case basis. Under the extraordinary facts of this case, O'Donnell and Reich owed plaintiffs a duty not to exploit CHP-acquired evidence in such a manner as to place them at foreseeable risk of grave emotional distress.

The trial court erred in granting judgment on the pleadings in favor of the CHP, inasmuch as plaintiffs have stated viable causes of action against O'Donnell and Reich, and the CHP may be vicariously liable under Government Code section 815.2, subdivision (a). However, the trial court properly sustained the demurrer of the CHP as to the section 1983 cause of action against it. The cause of action against the CHP failed due to the doctrine of sovereign immunity.

The section 1983 cause of action against O'Donnell and Reich also failed. Plaintiffs did not plead facts sufficient to allege that the actions of O'Donnell and Reich violated any clearly established constitutional right. Consequently, the doctrine of qualified immunity shielded O'Donnell and Reich from liability under section 1983. The trial court properly sustained the demurrers of O'Donnell and Reich as to the section 1983 cause of action.

I

FACTS

Plaintiffs Christos Catsouras, Lesli Catsouras, Danielle Catsouras, Christina Catsouras and Kira Catsouras filed a second amended complaint against the CHP, O'Donnell, and Reich following the death of decedent. In that complaint, plaintiffs alleged as follows. On October 31, 2006, decedent, the daughter of Christos and Lesli Catsouras and the sister of Danielle, Christina and Kira Catsouras, was decapitated in an automobile accident. CHP officers arrived at the scene, cordoned off the area where the accident occurred, and took control of decedent's remains. The CHP officers took multiple photographs of her decapitated corpse. The photographs were downloaded or otherwise transmitted to one or more CHP computers. O'Donnell and Reich, without plaintiffs' consent, e-mailed or otherwise transmitted "graphic and horrific photographs" of decedent to members of the public who were not involved in the official investigation of the car crash in which decedent perished. Thereafter, more than 2,500 Internet Web sites in the United States and the United Kingdom posted the photographs. Plaintiffs were subjected to malicious taunting by persons making use of the graphic and horrific photographs. For example, Christos Catsouras, decedent's father, received e-mails containing the photographs, including one entitled "Woo Hoo Daddy" that said, "Hey Daddy I'm still alive." Some Web sites painted decedent's life in a false light, including one that described decedent "as a 'stupid bitch,' [and] a 'swinger.' " As a proximate result of the acts of defendants, plaintiffs suffered severe emotional and mental distress.

Plaintiffs asserted eight causes of action: (1) violation of section 1983 (all defendants); (2) negligence (O'Donnell and Reich); (3) negligent infliction of

emotional distress (O'Donnell and Reich); (4) intentional infliction of emotional distress (O'Donnell and Reich); (5) invasion of privacy (O'Donnell and Reich); (6) negligent supervision and retention (CHP and O'Donnell); (7) tortious act or omission of public employees (Gov. Code, §§ 820, subd. (a), 820.8) (O'Donnell and Reich); and (8) vicarious liability of public entity (Gov. Code, § 815.2, subd. (a)) (CHP).

The CHP filed a demurrer as to the first and sixth causes of action. Plaintiffs thereafter dismissed the sixth cause of action as against the CHP only. The court sustained the demurrer as to the first cause of action, without leave to amend, holding that the CHP was not a "person" for the purposes of section 1983, and was immune from liability under the Eleventh Amendment to the United States Constitution and the doctrine of sovereign immunity.

Reich filed a demurrer challenging each of the causes of action against him. In their opposition to Reich's demurrer, plaintiffs alleged that the CHP's traffic collision report contained 50 photographs of the accident scene and decedent's uncovered decapitated corpse. They further alleged that O'Donnell and Reich had "released 9 of 50 graphic and horrific photographs to their family and friends via electronic mail for shock value on Halloween." Plaintiffs also alleged that the CHP had admitted that the unauthorized release of the photographs violated CHP policy.

The court sustained the demurrer without leave to amend. In so doing, it stated that while the conduct of third parties toward plaintiffs had been "utterly reprehensible," the conduct in question was that of Reich, who owed no duty of care to plaintiffs. A judgment of dismissal was entered with respect to Reich, and plaintiffs appealed.

In addition, O'Donnell filed a demurrer with respect to each cause of action against him. The court sustained that demurrer without leave to amend as well. Judgment was entered dismissing the complaint as to O'Donnell. Plaintiffs appealed.

With only one cause of action remaining against it, the CHP filed a motion for judgment on the pleadings. The CHP argued that because the remaining cause of action was for vicarious liability, and there were no remaining defendants upon which such liability could be based, it was entitled to judgment. The court granted the motion. Judgment was entered accordingly and plaintiffs appealed.

The appeals were consolidated in this court.

## II

## DISCUSSION

### A. *Introduction*

■ Government Code section 820 states: "(a) Except as otherwise provided by statute . . . , a public employee is liable for injury caused by his act or omission to the same extent as a private person. [¶] (b) The liability of a public employee . . . is subject to any defenses that would be available to the public employee if he were a private person." Government Code section 820.8, in turn, provides that a public employee is not exonerated "from liability for injury proximately caused by his own negligent or wrongful act or omission." ■ We apply general principles of tort law to determine the duty of CHP officers acting within the scope of their employment and the potential liability of the CHP and its officers arising out of the officers' conduct. (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 715–716 [110 Cal.Rptr.2d 528, 28 P.3d 249] (*Lugtu*).)

According to plaintiffs, the trial court erred in applying those ordinary principles of tort law, as well as certain federal and state statutory provisions. They maintain that they stated causes of action for: (1) invasion of privacy; (2) intentional infliction of emotional distress; (3) negligence; (4) vicarious liability of the CHP, pursuant to Government Code section 815.2, subdivision (a); and (4) violation of section 1983. We address these contentions in turn.

### B. *Standard of Review Applicable to State Law Claims*

With respect to the state law claims, "[t]he standard of review on an appeal from judgment of dismissal following sustaining of a general demurrer is guided by long settled rules. We treat the demurrer as admitting all material facts properly pleaded, as well as those which reasonably arise by implication, but not contentions, deductions or conclusions of fact or law. [Citations.] 'Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action on any theory. [Citations.] Moreover, ' "the allegations of the complaint must be liberally construed with a view to attaining substantial justice among the parties." ' [Citation.] A demurrer challenges only the legal sufficiency of the complaint, not the truth of its factual allegations or the plaintiff's ability to prove those allegations. [Citation.]" (*Yue v. City of Auburn* (1992) 3 Cal.App.4th 751, 756–757 [4 Cal.Rptr.2d 653] (*Yue*).) We discuss separately the more particular rules applicable in the context of the section 1983 action.

## C. *Invasion of Privacy*

Plaintiffs first argue that the court erred in holding they did not state a cause of action for invasion of privacy. They claim O'Donnell and Reich invaded their privacy by disclosing private facts.

 The elements of a claim of invasion of privacy based on the public disclosure of private facts are as follows: " '(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern.' [Citations.]" (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 214 [74 Cal.Rptr.2d 843, 955 P.2d 469].) The trial court relied on two cases in holding that plaintiffs had not stated a cause of action—*Miller v. National Broadcasting Co.* (1986) 187 Cal.App.3d 1463 [232 Cal.Rptr. 668] (*Miller*) and *Flynn, supra,* 149 Cal.App.3d 677.

In *Miller, supra,* 187 Cal.App.3d 1463, a man suffered a heart attack at home in his own bedroom. The paramedics arrived at the scene, accompanied by a television camera crew seeking footage for a documentary about the paramedics. (*Id.* at pp. 1469, 1474.) The camera crew filmed the paramedics' efforts to save the man. (*Id.* at p. 1469.) The film was shown on television a number of times—on the news (twice), on a documentary about the paramedics, and on various promotional spots for the documentary. (*Id.* at pp. 1469, 1475–1477.) The man died later that evening at the hospital and his wife and daughter sued the television company and others. (*Id.* at pp. 1469–1470.) The trial court granted summary judgment in favor of the defendants. (*Id.* at p. 1470.)

The appellate court reversed as to the wife and affirmed as to the daughter. (*Miller, supra,* 187 Cal.App.3d at p. 1493.) The court first held that the wife had stated a cause of action for trespass, inasmuch as the television company had not obtained her permission to enter her home and film the paramedics' actions. (*Id.* at pp. 1480–1481.) It then held that she had stated a cause of action for invasion of privacy—not based on public disclosure of private facts, but based on intrusion into the seclusion of her own home. (*Id.* at pp. 1481–1484.) It also held that she had stated a cause of action for intentional infliction of emotional distress. (*Id.* at pp. 1487–1488.)

The daughter, who did not live with her parents, but who saw the broadcast of the paramedics working on her father, also brought a cause of action based on intrusion into seclusion. (*Miller, supra,* 187 Cal.App.3d at pp. 1471, fn. 2, 1476, 1488–1489.) She alleged not that the camera crew had entered her own home, but rather that the broadcasts themselves constituted intrusions into her home. (*Id.* at p. 1489.) The appellate court in *Miller* declined to extend the

tort to cover her situation, stating that it "[did] not hold that such intrusion could not conceivably occur, but [that] delineation of a tort of [that] nature [would have to] await more appropriate circumstances." (*Id.* at p. 1489.)

*Miller, supra*, 187 Cal.App.3d 1463 is inapposite because it was based on a claim of invasion of privacy in the guise of intrusion into seclusion, not public disclosure of private facts. (See *id.* at p. 1482 [describing four distinct privacy interests].) It is also distinguishable because it had to do with a film clip of the paramedics working on a heart attack victim, rather than still images of a corpse. Although the daughter stated "that the telecast indicated that [the victim] was 'brought back' several times before he died," there is no indication that the film clip included any death images. (*Id.* at p. 1477.) To the contrary, even though the wife apparently characterized the clip as a broadcast of "the last moments of her dying husband's life," the case makes clear that he actually died later that evening at the hospital. (*Id.* at pp. 1469, 1475, 1488.) Furthermore, the film clip apparently did not include a shot of the victim's face or otherwise identify him. (*Id.* at p. 1475.) When the daughter saw the film clip on television she thought it pertained to her father because she recognized her parents' home and because she caught a fleeting glance of a tattoo she thought was her father's, not because the clip displayed his corpse for all the world to see. (*Id.* at pp. 1476–1477.)

The *Miller* court noted that the daughter's claim fell within the purview of *Flynn, supra*, 149 Cal.App.3d 677, which "precludes claims by *relatives* of victims wronged by *publicity* as a matter of sound policy." (*Miller, supra*, 187 Cal.App.3d at p. 1489.) The comment about *Flynn* was dictum, however, inasmuch as the *Miller* court held there was no intrusion into the seclusion of the daughter's home. In any event, *Flynn* did not address the dissemination of death images, and does not control in that context, as we shall show.

In *Flynn, supra*, 149 Cal.App.3d 677, the children of actor Errol Flynn brought a defamation action against both the author of a book about their father and the publisher of the book. According to their complaint, the book stated that their father was a Nazi spy and a homosexual. (*Id.* at p. 679.) In affirming the order sustaining the defendants' demurrer, the appellate court stated: " 'Defamation of a deceased person does not give rise to a civil right of action at common law in favor of the surviving spouse, family, or relatives, who are not themselves defamed.' " (*Id.* at p. 680.)

The *Flynn* court also rejected the plaintiffs' invasion of privacy claim. It stated: " 'It is well settled that the right of privacy is purely a personal one; it cannot be asserted by anyone other than the person whose privacy has been invaded, that is, plaintiff must plead and prove that *his* privacy has been invaded. [Citations.] Further, the right does not survive but dies with the

person. [¶] It is clear that the publication must contain some direct reference to the plaintiff. The publication must invade the plaintiff's privacy. Where the publication was directed at another individual and referred incidentally to the plaintiff but was not directed at him, no recovery can be had. Where the plaintiff's only relation to the asserted wrong is that he is a relative of the victim of the wrongdoer, and was unwillingly brought into the limelight, no recovery can be had.' (Italics in original.) [Citation.]" (*Flynn, supra*, 149 Cal.App.3d at p. 683.)

This language, standing in isolation, provides strong support for the position of O'Donnell and Reich. But the language must be read in context. *Flynn, supra*, 149 Cal.App.3d 677 cites a number of cases in support of the quotation. (*Id.* at p. 683.) Not one of those cases pertains to the dissemination of death images of a decedent. Instead, these cases have to do with written media discussing, or pictorial media portraying, the life of a decedent. (See *Coverstone v. Davies* (1952) 38 Cal.2d 315 [239 P.2d 876] [publicity surrounding arrest and trial of family member]; *Werner v. Times-Mirror Co.* (1961) 193 Cal.App.2d 111 [14 Cal.Rptr. 208] [newspaper article about man and deceased wife]; *James v. Screen Gems, Inc.* (1959) 174 Cal.App.2d 650 [344 P.2d 799] [movie about deceased husband]; *Kelly v. Johnson Publishing Co.* (1958) 160 Cal.App.2d 718 [325 P.2d 659] [magazine article about deceased boxer]; *Metter v. Los Angeles Examiner* (1939) 35 Cal.App.2d 304 [95 P.2d 491] [newspaper article, with lifetime photograph, about deceased wife]; *Hendrickson v. California Newspapers, Inc.* (1975) 48 Cal.App.3d 59 [121 Cal.Rptr. 429] [obituary revealing criminal past].) While the cited cases do show that, in some contexts, the right of privacy dies along with the person who is the subject matter of the publication, this is not invariably so.

The impact of death images on the living, the relatives of a decedent, has been addressed in other jurisdictions. Several cases of note include *National Archives and Records Admin. v. Favish* (2004) 541 U.S. 157 [158 L.Ed.2d 319, 124 S.Ct. 1570] (*National Archives*), *Sellers v. Henry* (Ky.Ct.App. 1959) 329 S.W.2d 214 (*Sellers*), and *Melton v. Bd. of County Com'rs of Hamilton County* (S.D. Ohio 2003) 267 F.Supp.2d 859 (*Melton*). Of course, none of these cases controls the matter before us, but each of them provides persuasive authority.

In *National Archives, supra*, 541 U.S. 157, the court addressed whether certain death scene images should be released under the Freedom of Information Act (5 U.S.C. § 552). In particular, it determined whether photographs of certain body parts of a decedent who had apparently committed suicide were exempt from disclosure under section 552(b)(7)(C) (Exemption 7(C)). (*National Archives, supra*, 541 U.S. at pp. 160–161.) "Exemption 7(C) excuses from disclosure 'records or information compiled

for law enforcement purposes' if their production 'could reasonably be expected to constitute an unwarranted invasion of personal privacy.' § 552(b)(7)(C)." (*National Archives, supra*, 541 U.S. at p. 160.)

The court emphasized that the decedent's relatives were invoking their own privacy rights, not the rights of the decedent. (*National Archives, supra*, 541 U.S. at p. 166.) This was made clear in the declaration of the decedent's sister, who stated: "[I am] 'horrified and devastated by [a] photograph [already] leaked to the press.' [Citation.] '[E]very time I see it,' [she] wrote, 'I have nightmares and heart-pounding insomnia as I visualize how he must have spent his last few minutes and seconds of his life.' [Citation.] . . . 'I fear that the release of [additional] photographs certainly would set off another round of intense scrutiny by the media. Undoubtedly, the photographs would be placed on the Internet for world consumption. Once again my family would be the focus of conceivably unsavory and distasteful media coverage.' [Citation.]" (*Id.* at p. 167.)

In determining whether the release of the death images would constitute an invasion of privacy within the meaning of Exemption 7(C), the court concluded that Congress "intended to permit family members to assert their own privacy rights against public intrusions long deemed impermissible under the common law and in our cultural traditions." (*National Archives, supra*, 541 U.S. at p. 167.) The court stated it "[had] little difficulty . . . in finding in our case law and traditions the right of family members . . . to limit attempts to exploit pictures of the deceased family member's remains for public purposes." (*Ibid.*) The court then explored the scope of the surviving family members' common law privacy rights.

As the court observed, "Burial rites or their counterparts have been respected in almost all civilizations from time immemorial. [Citations.] They are a sign of the respect a society shows for the deceased and for the surviving family members. . . . The outrage at seeing the bodies of American soldiers mutilated and dragged through the streets is . . . a[n] . . . instance of the . . . understanding of the interests decent people have for those whom they have lost. Family members have a personal stake in honoring and mourning their dead and objecting to unwarranted public exploitation that, by intruding upon their own grief, tends to degrade the rites and respect they seek to accord to the deceased person who was once their own. [¶] In addition this well-established cultural tradition acknowledging a family's control over the body and death images of the deceased has long been recognized at common law." (*National Archives, supra*, 541 U.S. at pp. 167–168.)

In addition, the court stated: " 'It is the right of privacy of the living which it is sought to enforce here. That right may in some cases be itself violated by

improperly interfering with the character or memory of a deceased relative, but it is the right of the living, and not that of the dead, which is recognized. A privilege may be given the surviving relatives of a deceased person to protect his memory, but the privilege exists for the benefit of the living, to protect their feelings, and to prevent a violation of their own rights in the character and memory of the deceased.' [Citation.]" (*National Archives, supra*, 541 U.S. at pp. 168–169.)

In short, the court in *National Archives, supra*, 541 U.S. 157, recognized that family members have a privacy right in the death images of a decedent. Yet O'Donnell and Reich say this privacy right is limited to the context of the Freedom of Information Act. As they see it, family members can invoke the right to block the dissemination of death images under that federal act, but not otherwise. After all, the court in *National Archives, supra*, 541 U.S. 157 did state "that the statutory privacy right protected by Exemption 7(C) goes beyond the common law and the Constitution. [Citations.]" (*National Archives, supra*, 541 U.S. at p. 170.)

At the same time, however, the court in *National Archives, supra*, 541 U.S. 157 continued on to state: "It would be anomalous to hold in the instant case that the statute provides even less protection than does the common law." (*Id.* at p. 170.) In other words, the court reviewed the scope of the family members' privacy right under common law and then concluded that the right could be no less extensive under Exemption 7(C). It did not limit the application of the family members' privacy right to the Freedom of Information Act context. Indeed, one commentator has construed *National Archives* as "[giving] the green light to judges across the country to recognize family members' privacy rights over the images of their dead loved ones beyond the narrow confines of [Freedom of Information Act] access disputes." (Calvert, *The Privacy of Death: An Emergent Jurisprudence and Legal Rebuke to Media Exploitation and a Voyeuristic Culture* (2006) 26 Loy. L.A. Ent. L.Rev. 133, 136.)

The court in *Miller, supra*, 187 Cal.App.3d 1463, of course, did not have the opportunity to address the discussion of common law as contained in *National Archives, supra*, 541 U.S. 157, which was decided more than 17 years later. The *Miller* court had before it only the line of California cases arising out of the rights of family members to stop the publication of written media concerning, and the release of movies portraying, the life of a decedent. Furthermore, *Miller* did not deal with the publication of death images per se.

We note that courts in other states, having addressed factual situations much more nearly akin to the one before us, have concluded, as did the

Supreme Court in *National Archives, supra*, 541 U.S. 157, that family members do have their own privacy rights in death images. Two such cases are *Sellers, supra*, 329 S.W.2d 214 and *Melton, supra*, 267 F.Supp.2d 859.

In *Sellers, supra*, 329 S.W.2d 214, an appellate court in Kentucky addressed a matter where a state police officer, in the line of duty, took photographs of the mutilated corpse of the plaintiffs' child and those photographs were in some manner published. The court, recognizing a privacy right in the plaintiffs, reversed a summary judgment against them. It stated that the plaintiffs could not recover for invasion of privacy unless the decedent had been identified as the person in the photograph, and countervailing issues of public interest did not excuse the invasion of privacy. (*Id.* at pp. 215–216.) Because the plaintiffs' complaint and the defendant's affidavit left genuine issues of material fact on these points, summary judgment was inappropriate. (*Id.* at p. 216.) The court observed: "[W]e are not advised of any basis upon which it could be held that a police officer who has taken a picture in the line of his duties has an absolute and unqualified right to publish it without regard to purpose." (*Id.* at p. 216.)

In *Melton, supra*, 267 F.Supp.2d 859, the surviving siblings of the decedent brought a section 1983 action against a photographer, a county coroner, and related parties. They alleged that the coroner and other defendants had permitted the photographer to touch and pose their brother's body and photograph it for commercial purposes. (*Melton, supra*, 267 F.Supp.2d at p. 861.) On a motion for judgment on the pleadings, the district court addressed whether the plaintiffs had stated a viable claim founded on theories of deprivation of property or invasion of privacy. (*Id.* at p. 862.) It held that they had. (*Id.* at p. 865.)

With respect to the invasion of privacy cause of action, the *Melton* court stated: "It is not difficult . . . to find that families have a right not to be embarrassed or humiliated by the outrageous display or exposure to public view of the remains of a loved one. This is not to say that the official photography of decedent at the scene of death or in an autopsy report would provide the basis for such a claim, as long as such official photos remained in the files of the coroner and they were not released to the public. However, as such documentary photographs ordinarily would not be in the public domain, the use of such photos for personal gain may be actionable . . . ." (*Melton, supra*, 267 F.Supp.2d at p. 865.)

Of course, as noted previously, neither *Sellers, supra*, 329 S.W.2d 214 nor *Melton, supra*, 267 F.Supp.2d 859 governs the matter before us, but the cases do constitute persuasive authority. (See also *Douglas v. Stokes* (1912) 149 Ky. 506 [149 S.W. 849]; *Bazemore v. Savannah Hospital* (1930) 171 Ga. 257

[155 S.E. 194]; but see *Waters v. Fleetwood* (1956) 212 Ga. 161 [91 S.E.2d 344].) Moreover, California case law has not heretofore addressed the precise issue before us, having to do with gruesome death images that were in the control of law enforcement officers and allegedly disseminated out of sheer morbidity or gossip, as opposed to any official law enforcement purpose or genuine public interest.

We recognize that there are instances in which matters pertaining to the dead or dying may involve issues of public interest, as in *Miller, supra*, 187 Cal.App.3d 1463. (See also *Waters v. Fleetwood, supra*, 91 S.E.2d 344.) The court in *Miller* assumed that public education about the paramedics' use of lifesaving techniques would qualify as news. (*Miller, supra*, 187 Cal.App.3d at p. 1491.) It also noted that the constitutional protection afforded freedom of the press "must be considered when any private citizen seeks to impose civil liability for invasion of privacy by the press or media through access to state courts. [Citation.]" (*Id.* at pp. 1491–1492.)

■ In the matter before us, however, there is no indication that any issue of public interest or freedom of the press was involved. " 'In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern.' " (*Virgil v. Time, Inc.* (9th Cir. 1975) 527 F.2d 1122, 1129.) Put another way, morbid and sensational eavesdropping or gossip "serves no legitimate public interest and is not deserving of protection. [Citations.]" (*Diaz v. Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 126 [188 Cal.Rptr. 762].)

Here, the picture painted by the second amended complaint is one of pure morbidity and sensationalism without legitimate public interest or law enforcement purpose. The trial court erred in sustaining the demurrers of O'Donnell and Reich as to the cause of action for invasion of privacy.

D. *Intentional Infliction of Emotional Distress*

■ "The elements of the tort of intentional infliction of emotional distress are: ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . ." Conduct to be outrageous must be

so extreme as to exceed all bounds of that usually tolerated in a civilized community.' [Citation.]" (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903 [2 Cal.Rptr.2d 79, 820 P.2d 181] (*Christensen*).) "It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." (*Ibid.*)

O'Donnell contends that plaintiffs' allegations are insufficient to state a cause of action for intentional infliction of emotional distress because plaintiffs neither alleged that the challenged conduct was directed at them nor alleged that they were present at the time of the dissemination of the photographs. Had plaintiffs alleged only reckless conduct on the part of O'Donnell and Reich, we would have to agree that, under current California law, their complaint would fail to state a cause of action for intentional infliction of emotional distress. Case law shows that "if reckless conduct is the basis for recovery, the plaintiff is usually present at the time of the conduct and is known by the defendant to be present. [Citation.]" (*Christensen, supra*, 54 Cal.3d at p. 905.) Plaintiffs here do not allege that they were present when the e-mails were sent.

However, in their second amended complaint, in addition to alleging reckless conduct, plaintiffs also alleged that the e-mails were sent "with the intention of causing" emotional distress to decedent's close family members. On appeal, they emphasize that the CHP was aware, at least as of the time Christos Catsouras identified himself at the accident scene, that he was decedent's father. Plaintiffs speculate that the e-mails must have contained identifying information about them in order for Internet users to have targeted them.

In reviewing a ruling on a demurrer, we must bear in mind that the allegations of the complaint are to be liberally construed. (*Yue, supra*, 3 Cal.App.4th at p. 757.) The allegation here may be liberally construed as asserting that O'Donnell and Reich directed their conduct towards plaintiffs. In addition, there is no dispute that plaintiffs alleged that they suffered severe emotional distress and that the extreme and outrageous conduct of O'Donnell and Reich proximately caused the same. Consequently, the trial court should have overruled the demurrers as to the cause of action for intentional infliction of emotional distress, and erred in doing otherwise.

E. *Negligence*

 (1) *Cause of action*

As an introductory note, we observe that plaintiffs, in their second amended complaint, framed both negligence and negligent infliction of

emotional distress causes of action. To be precise, however, "the [only] tort with which we are concerned is negligence. Negligent infliction of emotional distress is not an independent tort [citation], nor is negligent mishandling of human remains." (*Christensen, supra*, 54 Cal.3d at p. 884, fn. omitted.)

### (2) *General negligence principles*

■ " 'A tort, whether intentional or negligent, involves a violation of a *legal duty*, imposed by statute, contract or otherwise, owed by the defendant to the person injured. Without such a duty, any injury is "damnum absque injuria"—injury without wrong. [Citations.]' [Citation.] Thus, in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury. [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292–293 [253 Cal.Rptr. 97, 763 P.2d 948].) "[B]ecause liability for negligence turns on whether a duty of care is owed, our first task is to determine whether a duty exists in the present case." (*Id.* at p. 293.)

■ "The existence of a duty of care is a question of law to be determined by the court alone. [Citations.] This is because 'legal duties are . . . merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' [Citation.] Duty is simply a shorthand expression for the sum total of policy considerations favoring a conclusion that the plaintiff is entitled to legal protection. [Citation.]" (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 265 [80 Cal.Rptr.2d 196] (*Adams*).)

"In assessing the question of duty in cases challenging the conduct of law enforcement personnel generally, appellate courts in this state . . . have employed a variety of standards drawn from broad principles of tort law. Arguably, the more common approach has been to apply the multifactor duty analysis first articulated in the landowner liability case of *Rowland, supra*, 69 Cal.2d 108. [Citations.] Other courts have relied on the more amorphous 'special relationship' doctrine . . . which has been used to explain cases that imposed a duty on police officers to protect individual members of the citizenry in some contexts. [Citations.] [¶] In some instances, our Supreme Court has engaged in a duty analysis under both standards [citations]. However, the interrelationship between the traditional duty analysis and the 'special relationship' doctrine has never been clearly defined." (*Adams, supra*, 68 Cal.App.4th at pp. 266–267.) The parties in the case before us touch upon both lines of cases, but without really distinguishing between the two.

### (3) *Special relationship*

As stated in *Adams, supra,* 68 Cal.App.4th 243: "Our Supreme Court has acted to dispel 'widely held misconceptions' that law enforcement's public safety function imposes a duty on police officers to protect individual constituents as opposed to the general public. [Citation.] Although police officers regularly respond to third parties' requests for assistance, they are not professional Good Samaritans subject to a ' "novel" ' claim of malpractice whenever their response falls short of ' "what reasonably prudent police employees would have done in similar circumstances." ' [Citation.] ' "A person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people, *but neither does he assume any greater obligation to others individually. The only additional duty undertaken by accepting employment as a police officer is the duty owed to the public at large.*" ' [Citation.]" (*Id.* at pp. 274–275.)

The *Adams* court characterized this rule of law as the "public duty" rule. (*Adams, supra,* 68 Cal.App.4th at p. 275.) It further explained: "States adopting the public duty rule often permit a 'narrow exception' for unusual police conduct that creates a 'special relationship' between the police officer and an individual member of the public. [Citation.] This special relationship exception to the public duty rule has been adopted in California as well. In the case of law enforcement officers, a special relationship only has been found in a *'few narrow circumstances.'* [Citation.]" (*Id.* at pp. 276–277, fn. omitted.) "Perhaps fortified by the recognition that the special relationship exception is reserved for a limited class of unique cases, precious few courts have actually imposed a duty of care on law enforcement officers under this doctrine." (*Id.* at pp. 279–280.) Such cases "involved police officers who made misrepresentations that induced a citizen's detrimental reliance [citation], placed a citizen in harm's way [citations], or lulled a citizen into a false sense of security and then withdrew essential safety precautions [citation]." (*Id.* at p. 280.)

In their second amended complaint, plaintiffs in the case before us alleged that when the CHP cordoned off the area of the accident, undertook an investigation which included the taking of photographs, and took control of decedent's remains and her death images, a special relationship arose between the CHP and its officers, on the one hand, and plaintiffs, on the other. Plaintiffs alleged the CHP and its officers owed them a duty of care to use the death images exclusively for the purpose of the accident investigation, to protect their privacy and property rights in those images, and to avoid foreseeable harm to them by spreading the images across the Internet. Plaintiffs cite *Lugtu, supra,* 26 Cal.4th 703 and *Williams v. State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137] (*Williams*), among other cases, in support of their position.

In *Lugtu, supra,* 26 Cal.4th 703, a CHP officer directed the driver of a speeding car to pull over into the center median of the highway. (*Id.* at pp. 707–708.) There, a truck rear-ended the car, causing serious injury to its passengers. (*Id.* at p. 709.) The Supreme Court held that the trial court erred in granting summary judgment in favor of the CHP and the CHP officer. (*Id.* at pp. 707, 726.) The court stated: "Consistent with the basic tort principle recognizing that the general duty of due care includes a duty not to expose others to an unreasonable risk of injury at the hands of third parties, past California cases uniformly hold that a police officer who exercises his or her authority to direct another person to proceed to—or to stop at—a particular location, owes such a person a duty to use reasonable care in giving that direction, so as not to place the person in danger or to expose the person to an unreasonable risk of harm." (*Id.* at p. 717.)

In the case before us, the only plaintiff alleged to have arrived at the accident scene and asked to see decedent was Christos Catsouras. It is alleged that the CHP precluded him from entering the cordoned-off area. There is no suggestion that the CHP, by so doing, put him in harm's way. *Lugtu, supra,* 26 Cal.4th 703, therefore, would appear to have little application to the matter before us.

Plaintiffs nevertheless emphasize the portion of *Lugtu* to the effect that a CHP officer owes a duty of care when engaging "in '*an affirmative act which places the person in peril or increases the risk of harm* . . . .' [Citation.]" (*Lugtu, supra,* 26 Cal.4th at p. 717.) They argue that O'Donnell and Reich engaged in the affirmative act of disseminating decedent's death images on the Internet, thereby placing plaintiffs at risk of suffering exactly the emotional harm that they did.

The *Lugtu* court, in making the statement upon which plaintiffs rely, was quoting *Williams, supra,* 34 Cal.3d at page 24. (*Lugtu, supra,* 26 Cal.4th at p. 717.) *Williams* is more helpful to our analysis, inasmuch as it addressed issues pertaining to accident investigation. In *Williams,* the court addressed "whether the mere fact that a highway patrolman comes to the aid of an injured or stranded motorist creates an affirmative duty to secure information or preserve evidence for civil litigation between the motorist and third parties." (*Williams, supra,* 34 Cal.3d at p. 21.) It found "that stopping to aid a motorist does not, in itself, create a special relationship which would give rise to such a duty." (*Ibid.*)

The *Williams* court stated: "[T]he state highway patrol has the right, but not the duty, to investigate accidents [citations] or to come to the aid of stranded motorists [citation]. Nevertheless, although 'no special relationship may exist between members of the California Highway Patrol and the

motoring public generally, or between the Patrol and stranded motorists generally' [citation], when the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization. [Citations.]" (*Williams, supra*, 34 Cal.3d at p. 24, fn. omitted.) The court concluded that the plaintiff had failed to establish that the defendant owed her a duty of care. (*Id.* at p. 27.) It observed that the officers did not create the plaintiff's perilous situation, did not take any affirmative action increasing the risk of harm to her, and did not assume the responsibility to collect evidence for her future litigation. (*Id.* at pp. 27–28.) The court further observed that "there [were] no allegations of the requisite factors to a finding of special relationship, namely detrimental reliance by the plaintiff on the officers' conduct, statements made by them which induced a false sense of security and thereby worsened her position." (*Id.* at p. 28, fn. omitted.)

In the matter before us, the CHP, while not obligated to investigate the accident, chose to do so. However, there is no allegation that the CHP officers who responded to the scene engaged in any act upon which plaintiffs detrimentally relied or which lulled them into a false sense of security and thereby worsened their position. Plaintiffs do not explain how, when the CHP officers precluded Christos Catsouras from seeing the decapitated corpse, they thereby worsened his position. They also do not explain what action the officers in attendance took, during their investigation, that created a special relationship between themselves and those of plaintiffs who were not present. In any event, a special relationship would not ordinarily arise vis-à-vis prospective plaintiffs who were not present at the scene since "the intended beneficiaries of any [accident] investigation that is undertaken [by the CHP] are the People as prosecutors in criminal cases, not private plaintiffs in personal injury actions."[1] (*Williams, supra*, 34 Cal.3d at p. 24, fn. 4.)

Furthermore, there is no allegation that either O'Donnell or Reich was present at the scene or had any interaction with plaintiffs. And, the actions of the officers at the scene could not have given rise to a special relationship between O'Donnell and Reich, on the one hand, and plaintiffs, on the other. As explained in *City of Santee v. County of San Diego* (1989) 211 Cal.App.3d 1006 [259 Cal.Rptr. 757], even when one officer's actions create a special relationship between himself and an individual with whom he or she has interacted, "the only person obligated by the special relationship is the

---

[1] Vehicle Code section 2412 provides: "All members of the California Highway Patrol *may* investigate accidents resulting in personal injuries or death and gather evidence for the purpose of prosecuting the person or persons guilty of any violation of the law contributing to the happening of such accident." (Italics added.)

individual [officer], not every member of the agency which [employs him or her]." (*Id.* at p. 1017, italics & capitalization omitted.)

Simply put, plaintiffs in the matter before us cite no law enforcement case supporting their argument that a special relationship was created on these facts. Instead, plaintiffs rely on the case of *Christensen, supra*, 54 Cal.3d 868, which does not have to do with law enforcement matters, to demonstrate the existence of a special relationship between themselves and defendants. In *Christensen*, certain mortuary and crematory defendants had contracted to provide funeral-related or crematory services, as discussed in more detail *post*. (*Id.* at pp. 877–878, 890–891.) The court held the defendants had "assumed a duty to the close relatives of the decedents for whose benefit they were to provide funeral and/or related services. They thereby created a special relationship obligating them to perform those services in the dignified and respectful manner the bereaved expect of mortuary and crematory operators." (*Id.* at p. 891, fn. omitted.) That portion of *Christensen* is inapposite, however, inasmuch as there is no allegation that defendants in the matter before us assumed any contractual obligation to provide services to plaintiffs. Consequently, *Christensen* provides no basis for claiming a special relationship between the parties here.

Plaintiffs also contend Health and Safety Code section 7100, subdivision (a)(4) provides a statutory basis for a special relationship between themselves and defendants. Section 7100, subdivision (a) identifies, in order of priority, the persons who have "[t]he right to control the disposition of the remains of a deceased person, the location and conditions of interment, and arrangements for funeral goods and services to be provided," and upon whom "the duty of disposition and the liability for the reasonable cost of disposition of the remains devolves . . . ." Plaintiffs here contend subdivision (a)(4) bestowed the enumerated rights upon decedent's surviving parents.

More to the point, plaintiffs urge us to read the statute expansively, to give the persons identified thereunder not only the rights specifically enumerated in the statute, but also the right to control their decedent's death images. Plaintiffs then ask us to conclude that there was a special relationship between them, as the persons entitled to control decedent's death images, and the CHP, O'Donnell and Reich, who disseminated those death images. We do not so conclude.

" 'In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. [Citations.]' " (*Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].) Health and

Safety Code "[s]ection 7100 establishes rights and duties in the disposition of human remains . . . ." (*Christensen, supra,* 54 Cal.3d at p. 880.) The statute is part of a "statutory scheme [that] establishes only an orderly process by which to ensure that proper disposition is made of human remains." (*Id.* at pp. 896–897, fn. omitted.) Section 7100 says nothing about the right to control photographs of a decedent. It is not our place to add that right to the bundle of rights otherwise bestowed upon the persons designated in the statute. (See *Greyhound Lines, Inc. v. County of Santa Clara* (1986) 187 Cal.App.3d 480, 487 [231 Cal.Rptr. 702].) Inasmuch as section 7100 does not provide the persons who have the right to dispose of human remains with the additional right to control photographs of those remains, it does not serve as a basis for creating a special relationship between those persons and any CHP officers who may handle such photographs.

We conclude that the special relationship doctrine does not provide the underpinnings of a duty of care running in favor of plaintiffs here. That is not the end of our inquiry, however.

### (4) Rowland *factors*

#### (a) *Introduction*

■■■ "It is a fundamental proposition of tort law that one is liable for injuries caused by a failure to exercise reasonable care. We have said, however, that in considering the existence of 'duty' in a given case several factors require consideration including 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]' (*Rowland*[, *supra,*] 69 Cal.2d 108, 113 . . . ; [citations].) When public agencies are involved, additional elements include 'the extent of [the agency's] powers, the role imposed upon it by law and the limitations imposed upon it by budget; . . .' [Citations.]" (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728] (*Thompson*).)

#### (b) *Application*

Certain of these factors were addressed in *Christensen, supra,* 54 Cal.3d 868, upon which plaintiffs rely. In *Christensen*, a class action was brought against certain mortuaries and crematoria, as well as a biological supply

company that allegedly purchased human body parts from the crematoria. (*Id.* at pp. 876–878.) The complaint alleged that the defendants had mishandled and mutilated human remains, commingled the remains, and violated a number of statutory provisions. (*Id.* at p. 878.) The trial court ruled that only those plaintiffs who had contracted for the services of the mortuaries and crematoria, or who had a statutory right to direct the disposition of the human remains, had standing to bring an action for emotional distress caused by the intentional or negligent mishandling of the remains. (*Id.* at pp. 875, 880.) On appeal, the ruling was treated as a ruling on a demurrer. (*Id.* at p. 876.)

■ The Supreme Court held: "[T]he class of persons who may recover for emotional distress negligently caused by the defendants is not limited to those who have the statutory right to control disposition of the remains and those who contract for disposition. . . . As in all recovery for negligence, the potential plaintiff must be a person to whom the defendant owes a duty recognized by the law. In this context, the duty is owed only to those close family members who were aware that funeral and/or crematory services were being performed, and on whose behalf or for whose benefit the services were rendered." (*Christensen, supra,* 54 Cal.3d at p. 875.)

In reaching this conclusion, the court applied certain of the *Rowland* factors. (*Christensen, supra,* 54 Cal.3d at pp. 885–886, 894–898.) It first addressed the foreseeability of harm and the degree of certainty that the plaintiffs had suffered injury. (*Id.* at p. 894.) The court noted that, where the preparation of a body for burial was concerned, " ' "[t]he exhibition of callousness or indifference, the offer of insult and indignity, can, of course, inflict no injury on the dead, but they can visit agony akin to torture on the living." ' " (*Id.* at p. 895.) It further observed that " '[t]he tenderest feelings of the human heart center around the remains of the dead.['] " (*Ibid.*) The court also indicated that the mortuary defendants and crematory defendants did not challenge the assumption that it was foreseeable that the mishandling of human remains would likely result in serious emotional distress to a decedent's family members. (*Id.* at p. 894.) So too, here, it unquestionably was foreseeable that the parents and siblings of a decapitated teenager would suffer emotional harm upon seeing the photographs of her mutilated remains strewn across the Internet, and defendants give us no reason at this juncture to question the certainty that emotional trauma was indeed suffered. While the CHP contends it was not foreseeable that the gruesome photographs allegedly disseminated for shock value on Halloween would be forwarded to thousands of Internet users, in these days of Internet sensationalism, we must disagree.

As for moral blame, the *Christensen* court stated that there was no question that the conduct of the crematory defendants, and the conduct of the other

defendants who knew or should have known of the misconduct of the crematory defendants, was reprehensible and outrageous. (*Christensen, supra*, 54 Cal.3d at p. 896.) The court noted that various "statutes reflect a policy of respecting the religious, ethical, and emotional concerns of close relatives and others having an interest in assuring that the disposition of human remains is accomplished in a dignified and respectful manner" and ensuring "the sensibilities of all survivors" are protected. (*Id.* at p. 897.) It further indicated that imposing civil liability for the alleged misconduct was appropriate given the degree of moral blame and would serve to deter similar conduct in the future. (*Id.* at p. 898.)

*Christensen, supra*, 54 Cal.3d 868 is, of course, distinguishable from the case before us inasmuch as the crematory and mortuary defendants in *Christensen* contracted to provide decent and respectable crematory and funeral services, whereas defendants in the case before us did not undertake any contractual obligation to provide services of any type on behalf of plaintiffs. Moreover, where there were statutes at issue in *Christensen* regulating the conduct of the crematory and mortuary defendants, for the benefit of the bereaved, the parties here have cited no statutes regulating the conduct of defendants with respect to the treatment of decedent's remains or the handling of her death images. This notwithstanding, the alleged conduct of defendants here violates public policy protecting the emotional sensibilities of surviving family members, just as did the alleged conduct of the defendants in *Christensen*. Reasonable minds could differ as to who engaged in the most shocking behavior—defendants in the matter before us or the defendants in *Christensen*. That debate aside, concepts of morals and justice clearly dictate that those upon whom we rely to protect and serve ought not be permitted to make our deceased loved ones the subjects of Internet spectacle and then to claim the defense of lack of duty.

Continuing its discussion of the *Rowland* factors, the *Christensen* court also addressed the question of the burden to the defendants, and the consequences to the community, of imposing a duty upon the defendants in favor of the plaintiffs. (*Christensen, supra*, 54 Cal.3d at p. 898.) The defendants there argued that to hold them liable to the class of plaintiffs seeking damages would impose an unbearable burden, would result in an increase in the costs of funeral-related services and/or a decrease in the availability of such services, and would thus be detrimental to the public. (*Ibid.*) The court rejected those arguments. It stated: "Limiting the plaintiffs to those close relatives who were aware that the services were being performed and for whom the services were performed significantly reduces defendants' potential liability for negligently inflicted emotional distress. The egregious and intentional nature of the conduct at issue suggests that imposing liability does not threaten defendants with future or continuing liability for conduct over which they have no control. Liability for negligently inflicted emotional distress

exists only for those acts that would foreseeably cause serious emotional distress to foreseeable victims to whom a duty is owed. While the intentional nature of the conduct involved suggests that insurance may not be available as a means by which to defray the expense, the cost to defendants of avoiding or preventing similar misconduct in the future is minimal." (*Ibid.*, fn. omitted.)

Similarly, in the case before us, we reject the notion that imposing liability on defendants vis-à-vis these particular plaintiffs would impose an intolerable burden on the CHP and its officers to control their future conduct. It is not as though the subject matter of the litigation were an occurrence over which defendants had no control. In their opposition to Reich's demurrer, plaintiffs alleged that the dissemination of the photographs was against CHP policy. If defendants are held liable, the CHP will have an incentive to ensure future compliance with that policy. Or, if no such policy actually exists, then the CHP will have an incentive to establish one.[2]

■ The CHP claims that to hold it liable here would be to impose upon it the impossible task of conducting investigations and gathering evidence in such a manner as to avoid harm to family members, victims, and even criminal suspects. It also asserts that there would be adverse consequences to the community, inasmuch as law enforcement personnel would be impeded in conducting their investigations, and might even refrain from making needed public service announcements, for fear of liability. These fears are unfounded, because the duty at issue here is not nearly as broad as the one the CHP frames. We simply hold that the CHP and its officers must refrain from exploiting gruesome death images by disseminating them to friends and family members or others with no involvement in official CHP activities.

On another point, the CHP states that it is not insured for emotional distress damages arising in this context and that to hold it liable would be to impose an undue burden on the public coffers. We are pained to contemplate the possibility that the public coffers are at risk. However, we are also aggrieved at the thought that the CHP should be relieved of liability for the consequences of the intentional acts of its officers, simply by saying there is no insurance coverage. If every defendant were excused from liability whenever his or her egregious behavior was uninsured, then no defendant would ever be held liable for intolerable acts.

The CHP insists there is another reason why the *Rowland* factors show there was no duty owing to plaintiffs in this matter. It contends the closeness

---

[2] We note that, as stated in *Lugtu, supra*, 26 Cal.4th 703, the provisions of a CHP policy "may not properly be viewed as *establishing* the applicable standard of care, but they may be *considered* by the trier of fact in determining whether or not an officer was negligent in a particular case." (*Id.* at p. 720.)

of the connection between the alleged acts and the harm suffered was lacking. The CHP argues there was a big leap from the dissemination of the photographs to the "mean spirited use" of them by third parties. We disagree that issues pertaining to the closeness of the connection preclude liability here. For the sake of discussion, we assume that O'Donnell and Reich did not personally e-mail the photographs to thousands of Web sites worldwide. Yet the allegation is that they e-mailed the photographs to family members and friends on Halloween for the purpose of grotesque sensationalism. It is perfectly foreseeable that those e-mails would be forwarded to others, for exactly the same purpose.

Furthermore, there is an interesting question here as to how Internet users at large became aware of the identities of decedent and her family members, and became apprised of the e-mail addresses of those family members. If O'Donnell and Reich included any identifying information in their e-mails, the closeness of the connection would become all the more certain, as would be the case if any of their friends and relatives identified the CHP as the source of the photographs. In any event, the photographs could not have spread across the Internet like wildfire, ending up in the hands of malefactors, had O'Donnell and Reich not e-mailed them in the first place.

And while the CHP points out that anyone driving by the scene of the accident could have taken a photograph of decedent's remains and distributed it, that is not the allegation. The allegation is that O'Donnell and Reich e-mailed the photographs and that those photographs were the ones ultimately re-sent to plaintiffs' e-mail addresses. The closeness of the connection is sufficient in this context to support a duty running in favor of plaintiffs, particularly in light of the weightiness of all the other *Rowland* factors.

One of those factors is the prevention of future harm. It is a sad day, to be sure, when those upon whom we rely to protect and serve do the opposite, and make the decapitated corpse of a teenage girl the subject of international gossip and disrespect, and inflict devastating emotional harm on the parents and siblings of that girl. Every CHP officer should know better.

As noted in *Thompson, supra,* 27 Cal.3d 741, in addition to the classic *Rowland* factors, there are a few additional factors to consider when the defendant is a public agency. (*Id.* at p. 750.) In that instance, the court should consider the scope of the agency's powers, the role imposed upon the agency by law, and the agency's budgetary limitations. (*Ibid.*) Here, there is no indication that it is not completely within the powers of the CHP to prohibit its officers from disseminating death images to friends and family

members for ghoulish thrill purposes. As for the role of the CHP, we have already observed that the CHP is under no obligation to stop and investigate an accident. However, if it chooses to do so, it must refrain from engaging in affirmative conduct that places the persons at the scene in harm's way. (*Lugtu, supra*, 26 Cal.4th at pp. 716–717; *Williams, supra*, 34 Cal.3d at p. 24.) Once photographic evidence is collected, it is not the role of the CHP or its officers to distribute that evidence to friends and family members. Concomitantly, it is not the role of the CHP or its officers to put the parents and siblings of the decedent at risk of harm of seeing the grotesque death images of their deceased loved one made the subject of Internet spectacle. Finally, we do not see how making it CHP policy to prohibit such actions, or prompting the CHP to enforce a preexisting policy to that effect, would have any material impact on the CHP budget, even in today's difficult financial times.

Having considered the classic *Rowland* factors and the supplemental public agency factors noted in *Thompson, supra*, 27 Cal.3d 741, as well as the analysis of *Christensen, supra*, 54 Cal.3d 868, we conclude that the defendants in the case before us owed a duty of care to plaintiffs not to place decedent's death images on the Internet for the lurid titillation of persons unrelated to official CHP business.

### (5) *Dead body cases*

O'Donnell and Reich urge us to reach a different conclusion. They maintain that they cannot be held liable for negligence, because as law enforcement officers, they simply had no duty towards the relatives of a decedent. They claim that both *Christensen, supra*, 54 Cal.3d 868, and this court's opinion in *Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168 [59 Cal.Rptr.3d 672] (*Melican*), make clear that only mortuaries and crematoria engaged in the handling of human remains owe duties of care to family members of a decedent. They further claim that those duties of care do not fall upon the CHP, which does not provide funeral or crematory services.

We have already observed that *Christensen, supra*, 54 Cal.3d 868 is factually distinguishable from the case before us. *Christensen* involved issues of funeral and crematory services contracts and statutory provisions concerning the handling of human remains. (*Id.* at pp. 877–878.) In contrast, in the matter before us the CHP was not hired to handle decedent's corpse and the statutes pertaining to the handling of human remains are inapplicable. However, the point of the matter, which O'Donnell and Reich overlook, is that the *Rowland* factors, as discussed in *Christensen*, are applicable here. An analysis of those factors compels the conclusion that O'Donnell and Reich did indeed have a duty to plaintiffs under the particular circumstances of this case.

O'Donnell and Reich retort that this court's own opinion in *Melican, supra*, 151 Cal.App.4th 168 highlights the limitations of *Christensen, supra*, 54 Cal.3d 868 and precludes the imposition of any duty in favor of plaintiffs in this case. In *Melican*, a widow donated her husband's body to a willed body program operated by the University of California, Irvine (UCI). The agreement the widow signed did not request UCI to return the cadaver after UCI was finished with it. Rather, she permitted UCI to dispose of the cadaver pursuant to state law. (*Melican, supra*, 151 Cal.App.4th at p. 172.) State law permitted cremation, and did not require the separate cremations of willed body program cadavers. (*Id.* at p. 180.)

Nonetheless, after the decedent's son learned of some negative publicity surrounding the willed body program, he requested that UCI return his father's cremains. (*Melican, supra*, 151 Cal.App.4th at pp. 172–173.) Although UCI was not bound to do so, it agreed. However, the son and his siblings suspected that the cremains that were delivered were not those of their father. They participated in consolidated lawsuits against the Regents of the University of California, asserting, inter alia, negligence. (*Id.* at p. 173.) The plaintiffs averred that UCI had a duty to ensure the cremains that were returned to a family were those of their family member exclusively, and also that UCI owed them a duty under *Christensen* because, when it agreed to return the cremains, it undertook the duties of a mortuary service provider. (*Id.* at pp. 172, 179.) Ultimately, summary judgment was granted in favor of the Regents and we affirmed. (*Id.* at pp. 171–172.)

We held that UCI had no duty either to ensure that cremains were not commingled or to fulfill the requirements of a mortuary service provider. (*Melican, supra*, 151 Cal.App.4th at pp. 172, 179.) In doing so, we stated: "We disagree that UCI, by agreeing to return [the decedent's] cremains, assumed the duties of a mortuary service provider. UCI does not purport to provide funeral-related services, and is not licensed to do so. '[F]uneral-related services are principally for the comfort of the living, having as their aim the consolation of the leading mourners. The expectations of the survivors, and "essence of the contract [for such services is] a reasonable expectation of dignity, tranquility, and personal consolation." [Citation.]' [Citation.] In contrast, the mission of UCI's [willed body program] is to obtain cadavers for study and dissection by medical students. In recognition of this distinction, the Legislature specifically exempted public institutions, hospitals, and medical schools from the Funeral Directors and Embalmers Law. (Bus. & Prof. Code, § 7609.) [¶] Of course, one may undertake a duty from which one is exempt by law, but plaintiffs presented no evidence UCI assumed a duty *to act as a mortuary or provider of funeral-related services.*" (*Melican, supra*, 151 Cal.App.4th at p. 179.) We further stated: "Considering all of the circumstances here, including the policy decisions underlying the Legislature's treatment of willed body programs, we conclude UCI had no

duty to ensure the remains of [the decedent] were free from commingling before returning them to [the decedent's] family." (*Id.* at p. 181.)

O'Donnell and Reich construe *Melican, supra,* 151 Cal.App.4th 168 to mean that the duty in favor of the family members of a decedent, as explained in *Christensen, supra,* 54 Cal.3d 868, is restricted to providers of funeral and crematory services. In other words, if the duty in favor of the family members of a decedent is not imposed upon persons running willed body programs, it certainly cannot be extended to law enforcement personnel. In making their arguments, O'Donnell and Reich ignore the underlying rationale of *Melican.* In *Melican,* the plaintiffs claimed UCI owed them a duty under *Christensen* because it had undertaken the duties of a mortuary service provider and also claimed UCI had undertaken not to commingle the cremains. (*Melican, supra,* 151 Cal.App.4th at pp. 179–180.) In analyzing the issues as framed, we concluded UCI had not undertaken either duty. (*Id.* at p. 172.)

In the context before us, *Melican, supra,* 151 Cal.App.4th 168 is simply inapposite. The statutes concerning willed body programs are inapplicable and there is no allegation that O'Donnell and Reich undertook to perform the duties of a mortuary service provider. More to the point, we are not concerned with the disposition of human remains at all. Rather, we are concerned with the exploitation of photographs of human remains, with the fostering of Internet sensationalism over a decapitated corpse, and with the foreseeable harm to the parents and siblings who suffered agony over that sensationalism.

Nothing we said in *Melican, supra,* 151 Cal.App.4th 168 forecloses a cause of action against O'Donnell or Reich for their alleged actions in this matter. To the contrary, in *Melican* we observed that the existence of a duty was determined by the consideration of several factors. (*Id.* at p. 178.) Those were the *Rowland* factors as discussed in *Christensen, supra,* 54 Cal.3d 868. (*Melican, supra,* 151 Cal.App.4th at p. 178.) We have already addressed those factors and concluded that defendants in this matter did owe a duty to plaintiffs under the particular circumstances of this case.

### (6) *Immunity*

The CHP argues that even if a duty were owing to plaintiffs, O'Donnell and Reich would be immune from liability, under Government Code section 821.6, and that the immunity would be extended to the CHP, by virtue of Government Code section 815.2, subdivision (b). Section 821.6 provides: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." (Gov. Code,

§ 821.6.) Section 815.2, subdivision (b) in turn provides: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." (Gov. Code, § 815.2, subd. (b).)

It has been held that the application of Government Code "[s]ection 821.6 is not limited to the act of filing a criminal complaint. Instead, it also extends to actions taken in preparation for formal proceedings. Because investigation is 'an essential step' toward the institution of formal proceedings, it 'is also cloaked with immunity.' [Citations.]" (*Amylou R. v. County of Riverside* (1994) 28 Cal.App.4th 1205, 1209–1210 [34 Cal.Rptr.2d 319] (*Amylou R.*).)

The public policy concerns underlying the immunity are instructive in the case before us. "[O]ur system of law enforcement depends upon 'the investigation of crime and the accusation of offenders by properly trained officers.' [Citations.] The impartiality of that system requires that, when exercising that responsibility, the officers are ' "free to act in the exercise of honest judgment uninfluenced by fear of consequences personal to themselves." ' [Citation.] To eliminate that fear of litigation and to prevent the officers from being harassed in the performance of their duties, law enforcement officers are granted immunity from civil liability . . . . [Citation.]" (*Amylou R., supra,* 28 Cal.App.4th at p. 1213.) Consistent with those public policy concerns, law enforcement officers in both *Amylou R., supra,* 28 Cal.App.4th 1205 and *Baughman v. State of California* (1995) 38 Cal.App.4th 182 [45 Cal.Rptr.2d 82] were held immune from liability for actions taken in furtherance of criminal investigations. (*Amylou R., supra,* 28 Cal.App.4th at pp. 1209–1211; *Baughman v. State of California, supra,* 38 Cal.App.4th at pp. 192–193.)

However, plaintiffs in the matter before us rightly ask how the e-mails of O'Donnell and Reich, allegedly sent to persons unrelated to the accident investigation, could have been transmitted in furtherance of the investigation. They also question how such factual issues could be disposed of on demurrer. Plaintiffs' queries are well founded. We too question how e-mails of the nature alleged could have been sent in furtherance of the accident investigation,[3] or how immunizing O'Donnell and Reich would further the public policy concerns underlying Government Code section 821.6. Moreover, we agree that resolution of these issues is not appropriate on demurrer. (See *Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1083 [32 Cal.Rptr.3d 483, 116 P.3d 1162] [on demurrer, we assume the truth of properly pleaded

---

[3] We note there is no allegation that the dissemination of the photographs was part of a press release, which would have raised a separate set of issues. (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1048 [55 Cal.Rptr.3d 158].)

material facts]; *Richardson-Tunnell v. Schools Ins. Program for Employees* (*SIPE*) (2007) 157 Cal.App.4th 1056, 1062 [69 Cal.Rptr.3d 176] [whether act performed for benefit of employer is question of fact].)

### F. *Government Code Section 815.2, Subdivision (a)*

Plaintiffs contend that the court erred in entering judgment in favor of the CHP because Government Code section 815.2, subdivision (a) makes the CHP vicariously liable for the acts of O'Donnell and Reich. That statute provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." (Gov. Code, § 815.2, subd. (a).)

The CHP states, at least for the purposes of the current appellate proceeding, that whether or not O'Donnell and Reich were acting within the course and scope of their employment is not determinative. Rather, at this juncture, the CHP simply argues that it cannot be held vicariously liable under Government Code section 815.2, subdivision (a) because plaintiffs have failed to state any cause of action against O'Donnell and Reich. As shown above, plaintiffs have not so failed. Consequently, the issue of the liability of the CHP under that statute precludes judgment on the pleadings in favor of the CHP.

### G. *Title 42 United States Code Section 1983*

#### (1) *Introduction*

■ "Section 1983 provides in pertinent part: 'Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .' " (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 828–829 [11 Cal.Rptr.3d 692, 87 P.3d 1] (*Venegas*).) "By the plain terms of § 1983, two—and only two—allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law. [Citation.]" (*Gomez v. Toledo* (1980) 446 U.S. 635, 640 [64 L.Ed.2d 572, 100 S.Ct. 1920] (*Gomez*).)

Here, plaintiffs alleged that the CHP, O'Donnell and Reich deprived them of their liberty without due process of law, by depriving them of their privacy

and by engaging in conduct that shocks the conscience. Plaintiffs also alleged that the three defendants deprived them of their property without due process of law, by appropriating the death images of decedent, which plaintiffs asserted belonged to them. They also asserted that these deprivations constituted violations of the Fourth, Ninth and Fourteenth Amendments to the United States Constitution. In addition, plaintiffs alleged that the actions were taken under the color of the laws of the State of California.

The CHP's demurrer was based on the Eleventh Amendment to the United States Constitution and the doctrine of sovereign immunity. The trial court granted the CHP's demurrer on those grounds.

In his demurrer, O'Donnell raised two grounds: (1) plaintiffs failed to plead a violation of a federal right; and (2) he was immune from liability based on the doctrine of qualified immunity. Reich based his demurrer on the doctrine of qualified immunity, including within that umbrella an argument that no federal right was violated. In its minute order sustaining O'Donnell's demurrer without leave to amend, the court held both that defendants had not violated any constitutional or other recognized federal right, and that the doctrine of qualified immunity applied to O'Donnell. In its minute order granting Reich's demurrer, the court did not articulate its reasoning with respect to the section 1983 cause of action, focusing only on the lack of a duty on the part of Reich with respect to the various causes of action.

(2) *Rules on demurrer in section 1983 actions*

The rules to be applied in evaluating a demurrer on a section 1983 cause of action were laid out in *Bach v. County of Butte* (1983) 147 Cal.App.3d 554 [195 Cal.Rptr. 268] (*Bach*). "[T]he state courts of California should apply federal law to determine whether a complaint pleads a cause of action under section 1983 sufficient to survive a general demurrer." (*Id.* at p. 563, fn. omitted.) For the purposes of a demurrer to "a section 1983 complaint, the allegations of the complaint are generally taken as true. [Citation.]" (*Ibid.*, fn. omitted.) When a section 1983 complaint is prepared by counsel, " '[t]he controlling standard . . . is that an action may be dismissed for failure to state a claim only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Furthermore, a pleading is insufficient to state a claim under the Civil Rights Act if the allegations are mere conclusions. [Citations.] Some particularized facts demonstrating a constitutional deprivation are needed to sustain a cause of action under the Civil Rights Act. [Citations.]" (*Bach, supra,* 147 Cal.App.3d at p. 564.)

### (3) *State immunity*

■ With these guidelines in mind, we examine the ruling on the CHP's demurrer first. "Under the Eleventh Amendment to the United States Constitution, and the doctrine of sovereign immunity, the state is absolutely immune from tort liability under the federal civil rights act (42 U.S.C. § 1983 . . .)." (*Venegas, supra*, 32 Cal.4th at p. 826.) Put another way, "[i]t is well established that states and state officers sued in their official capacity are not considered 'persons' for purposes of section 1983 and are immune from liability under that statute by virtue of the Eleventh Amendment to the United States Constitution and the doctrine of sovereign immunity. [Citation.]" (*Bougere v. County of Los Angeles* (2006) 141 Cal.App.4th 237, 242 [45 Cal.Rptr.3d 711] (*Bougere*); accord, *Kirchmann v. Lake Elsinore Unified School Dist.* (2000) 83 Cal.App.4th 1098, 1101 [100 Cal.Rptr.2d 289] (*Kirchmann*).) This immunity applies whether the action is brought in federal court or in state court. (*Kirchmann, supra*, 83 Cal.App.4th at pp. 1103–1104.)

The trial court in the matter before us correctly relied upon *Bougere, supra*, 141 Cal.App.4th 237 to hold that no section 1983 claim lies against the CHP as an instrumentality of the state. Because the CHP is absolutely immune from liability under section 1983, plaintiffs have failed to plead a viable section 1983 cause of action against it. The sustaining of the demurrer without leave to amend as to the section 1983 cause of action against the CHP was proper. (See *Greene v. Zank* (1984) 158 Cal.App.3d 497, 500, 513 [204 Cal.Rptr. 770]; *Bach, supra*, 147 Cal.App.3d at pp. 558–559, 571.)

### (4) *Qualified immunity of O'Donnell and Reich*

#### (a) *Preliminary matter*

Plaintiffs maintain that it is improper to even consider the question of qualified immunity at the pleading stage. They cite several cases in support of their position, including *Gomez, supra*, 446 U.S. 635 and *Venegas, supra*, 32 Cal.4th 820.

In *Gomez, supra*, 446 U.S. 635, a discharged employee sued the Superintendent of the Police of the Commonwealth of Puerto Rico, alleging that the discharge violated his procedural due process rights. (*Id.* at p. 636.) The superintendent moved to dismiss the complaint, under Federal Rules of Civil Procedure, rule 12(b)(6) (28 U.S.C.), for failure to state a cause of action. (*Gomez, supra*, 446 U.S. at p. 637.) The district court granted the motion, because the employee had failed to plead that the superintendent committed the alleged actions in bad faith. (*Ibid.*) The district court reasoned that the superintendent was entitled to qualified immunity for actions taken in good faith, so an allegation of bad faith was a pleading requirement. (*Id.* at pp. 637–638.) The Supreme Court reversed.

It stated: "Nothing in the language or legislative history of § 1983 . . . suggests that in an action brought against a public official whose position might entitle him to immunity if he acted in good faith, a plaintiff must allege bad faith in order to state a claim for relief." (*Gomez, supra*, 446 U.S. at pp. 639–640.) It noted that the employee had met pleading requirements by making the two required allegations—that he was deprived of a federal right, and that the defendant had acted under color of territorial or state law. (*Id.* at p. 640.) The court continued: "Since qualified immunity is a defense, the burden of pleading it rests with the defendant. [Citations.] . . . We see no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith." (*Ibid.*) In short, the *Gomez* court reaffirmed that a plaintiff need only make two allegations, one pertaining to the violation of a federal right and one pertaining to an action taken under color of territorial or state law; no additional allegations, in opposition to as-yet-unasserted defenses, need be made. It did not hold that the issue of qualified immunity cannot be determined on a motion to dismiss or its state law equivalent—a demurrer.

In *Venegas, supra*, 32 Cal.4th 820, a husband and wife brought a section 1983 action against a city, the city police department, one of its police officers, a county, the county sheriff's department, its sheriff and certain of its deputies, alleging unreasonable search and seizure. (*Venegas, supra*, 32 Cal.4th at p. 828.) The court addressed, inter alia, whether the sheriff's "deputies were entitled to *qualified* immunity under section 1983 because reasonable officers in their position would have believed their actions were lawful under established law." (*Id.* at p. 839.) Under the circumstances before it, the court remanded the matter to the appellate court for redetermination, since the issue in question was "primarily a factual one once the correct legal principles [were] identified, and the factual record [was] extensive . . . ." (*Id.* at p. 840.)

In the case before us, however, the dispositive issues on demurrer— whether plaintiffs had a federally protected property interest in the photographs or a federally protected liberty interest in terms of their privacy—do not require a factual resolution. Consequently, *Venegas, supra*, 32 Cal.4th 820 does not preclude a determination of the application of the doctrine of qualified immunity.

Most significantly, the propriety of resolving the qualified immunity issue at the pleading stage was recently made clear in *Pearson v. Callahan* (2009) 555 U.S. ___ [172 L.Ed.2d 565, 129 S.Ct. 808] (*Pearson*), wherein the Supreme Court held that summary judgment in favor of police officers was appropriate on the basis of qualified immunity. (*Id.* at p. ___ [129 S.Ct. at p. 813].) As the court stated: "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a

case is erroneously permitted to go to trial.' [Citation.] Indeed, we have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that ' "insubstantial claims" against government officials [will] be resolved prior to discovery.' [Citation.] Accordingly, 'we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' [Citation.]" (*Id.* at p. ___ [129 S.Ct. at p. 815].) Applying *Pearson*, we cannot agree with plaintiffs in the case before us that the matter of qualified immunity cannot be resolved on demurrer. (See also *Bach, supra*, 147 Cal.App.3d 554 [establishing rules regarding demurrers in § 1983 actions]; *Bullock v. City and County of San Francisco* (1990) 221 Cal.App.3d 1072 [271 Cal.Rptr. 44]; *Greene v. Zank, supra*, 158 Cal.App.3d 497.)

### (b) *General rules*

O'Donnell and Reich assert that they are entitled to qualified immunity under the facts of this case. "A rule of qualified immunity shields a public officer from an action for damages under section 1983 unless the officer has violated a 'clearly established' constitutional right. [Citation.] As stated in *Saucier* [*v. Katz* (2001) 533 U.S. 194 [150 L.Ed.2d 272, 121 S.Ct. 2151]], 'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. [Citation.]' [Citation.] The high court explained that '[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.' [Citation.]" (*Venegas, supra*, 32 Cal.4th at p. 840; see also *Pearson, supra*, 555 U.S. at p. ___ [129 S.Ct. at p. 815].)

The court in *Pearson, supra*, 555 U.S. ___ [129 S.Ct. 808], acknowledged that, in *Saucier v. Katz, supra*, 533 U.S. 194 (*Saucier*), it had previously enunciated a mandatory two-step sequence for resolving qualified immunity claims. (*Pearson, supra*, 555 U.S. at p. ___ [129 S.Ct. at p. 815].) Under the *Saucier* test, as the first step, the court was required to decide whether the alleged facts made out a violation of a constitutional right. (*Id.* at pp. ___–___ [129 S.Ct. at pp. 815–816].) If they did, as the second step, the court was required to "decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct. [Citation.]" (*Id.* at p. ___ [129 S.Ct. at p. 816].)

However, the *Pearson* court decided to revisit the two-step test of *Saucier*. The court stated: "On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." (*Pearson, supra*, 555 U.S. at p. ___ [129 S.Ct. at p. 818].)

Following *Pearson, supra*, 555 U.S. ___ [129 S.Ct. 808], then, while we have discretion in the order in which to address the issues, we must still determine (1) whether the alleged facts made out a violation of a constitutional right; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." (*Id.* at p. ___ [129 S.Ct. at p. 816].)

### (c) *Deprivation of property: right to photographs*

Plaintiffs claim they had a federally protected property interest in the photographs of decedent. They cite two cases of note in support of that theory—*Newman v. Sathyavaglswaran* (9th Cir. 2002) 287 F.3d 786 (*Newman*) and *Melton, supra*, 267 F.Supp.2d 859.

In *Newman, supra*, 287 F.3d 786, the Los Angeles County Coroner's Office removed the corneas of deceased children without notice to, or the consent of, their parents. (*Id.* at p. 788.) The parents brought a section 1983 action, alleging that the coroner had taken their property without due process of law. The Ninth Circuit Court of Appeals held that the district court had erred in dismissing the complaint for failure to state a claim upon which relief could be granted. It further held that the exclusive right of the next of kin to possess the bodies of their deceased family members created a property interest giving rise to due process rights under the Fourteenth Amendment to the United States Constitution. (*Newman, supra*, 287 F.3d at p. 788.) However, the case did not address whether family members of a decedent have a property interest in photographs of a decedent's corpse. Consequently, it cannot support the proposition that family members have a clearly established property interest in such photographs.

*Melton, supra*, 267 F.Supp.2d 859 is a case more nearly on point. There, the decedent's surviving siblings based their section 1983 claim not only on an invasion of privacy theory, but also on a deprivation of property theory. (*Melton, supra*, 267 F.Supp.2d at p. 862.) They alleged the photographer touched, posed, manipulated, photographed, and/or otherwise violated their brother's corpse. The court said that the allegations, if taken as true, showed that the photographer had "meddled with property interests of the Plaintiffs." (*Id.* at p. 863.)

The *Melton* court further stated: "Having reviewed Plaintiffs' deprivation of property claim, the Court finds sufficient allegations in their Complaint to

deny [the photographer's] motion. A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property. [Citation.] The Supreme Court has recognized that '[p]roperty is more than just the physical thing . . . it is also the sum of all the rights and powers incident to the ownership of the physical thing. It is the tangible and the intangible. Property is composed of constituent elements and of these elements the right to use the physical thing to the exclusion of others is the most essential and beneficial. . . .' [Citation.] As such, the Court finds that it is not necessary for [the photographer] to have stolen a body part from the corpse of Plaintiffs' brother in order to have violated their property right to his body." (*Melton, supra,* 267 F.Supp.2d at p. 863.)

The court's language indicates that it may have based its decision at least in part on the argument that the photographer's posing and manipulation of the corpse violated a property right to the corpse itself, rather than on the sole argument that the plaintiffs had a property right in the photographs. (*Melton, supra,* 267 F.Supp.2d at p. 863.) Consequently, it is not at all clear under *Melton* that family members have a federally protected property interest in the photographs of a decedent when there is no allegation that the defendant violated the corpse by touching and manipulating it. Even if *Melton* had clearly stated that family members have such a right, it would stand as one district court case in isolation, hardly giving rise to "a 'clearly established' constitutional right." (*Venegas, supra,* 32 Cal.4th at p. 840.) We conclude the doctrine of qualified immunity shields O'Donnell and Reich against a section 1983 action based on deprivation of a property interest in the photographs of decedent.

### (d) *Liberty interest: right to privacy*

Next, plaintiffs argue defendants' actions deprived them of their liberty without due process of law. They explain that they have a constitutionally protected right of privacy in decedent's photographs.

"The Constitution does not explicitly mention any right of privacy." (*Roe v. Wade* (1973) 410 U.S. 113, 152 [35 L.Ed.2d 147, 93 S.Ct. 705].) However, "the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution." (*Ibid.*) "[T]he right has some extension to activities relating to marriage, [citation]; procreation, [citation]; contraception, [citations]; family relationships, [citation]; and child rearing and education, [citations]." (*Id.* at pp. 152–153.)

As we have already discussed, *National Archives, supra,* 541 U.S. 157 recognized that the family members of a decedent have a common law

privacy right with respect to the dissemination of death images of a decedent. (*Id.* at pp. 167–169.) However, that case did not involve a section 1983 action. The parties cite no California or Ninth Circuit Court of Appeals case addressing whether a complaint alleging a violation of a family member's privacy right to photographs of a decedent is sufficient to state a cause of action under section 1983. However, *Melton, supra,* 267 F.Supp.2d 859, decided by a district court in Ohio, held that the right was deserving of constitutional protection and an alleged violation of the right was sufficient to support a cause of action under section 1983. (*Melton, supra,* 267 F.Supp.2d at pp. 863–865.)

 The question is "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct. [Citation.]" (*Pearson, supra,* 555 U.S. at p. ___ [129 S.Ct. at p. 816].) "As stated in *Saucier*[, *supra,* 533 U.S. 194], 'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. [Citation.]' [Citation.] The high court explained that '[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.' [Citation.] *Saucier* confirmed that . . . officers . . . must be granted immunity 'for reasonable mistakes as to the legality of their actions.' [Citation.]" (*Venegas, supra,* 32 Cal.4th at p. 840.)

At the time of the alleged conduct, *National Archives, supra,* 541 U.S. 157 and *Melton, supra,* 267 F.Supp.2d 859 had already been decided. However, *National Archives* not only did not address section 1983, it arose in the context of a Freedom of Information Act request, making its application in the context of an e-mail to a friend or family member perhaps less than obvious to a reasonable officer. (*National Archives, supra,* 541 U.S. at pp. 160–161.) *Melton, supra,* 267 F.Supp.2d 859 addressed the privacy right in a section 1983 context, but was one isolated case arising out of a district court in Ohio. Taken together, we cannot say these two cases put O'Donnell and Reich on notice that e-mailing the photographs would clearly violate a federal right. Consequently, we conclude the trial court did not err in applying the doctrine of qualified immunity to sustain their demurrers as to the section 1983 cause of action based on the violation of a liberty interest in the form of a right to privacy.

# III

## DISPOSITION

The judgments are reversed. Plaintiffs shall recover their costs on appeal.

Rylaarsdam, Acting P. J., concurred.

**ARONSON, J., Concurring.**—I concur in all of the majority's conclusions, including that plaintiffs have stated a claim for invasion of privacy against Department of the California Highway Patrol (CHP) Dispatcher Aaron Reich and Officer Thomas O'Donnell, for their allegedly unprivileged e-mail distribution of crash scene photographs of Nicole Catsouras's decapitated body. I write separately because I arrive at this conclusion by a slightly different analysis. As I will explain, I would expressly limit any familial right of privacy in death images to photographs taken during an autopsy or for the coroner at a cordoned-off accident scene, and which serve no newsworthy public interest. Circumscribed by these limitations, plaintiffs' invasion of privacy claim fits squarely within the contours of California privacy law. Accordingly, I also concur with the majority that plaintiffs have stated a negligence cause of action. Although neither of the individual defendants nor the CHP undertook a duty of care with respect to plaintiffs, and none of the defendants had a special relationship with plaintiffs, California privacy law imposed duties on defendants to avoid intrusion into plaintiffs' privacy right in the photographs or, stated differently, to avoid publicizing private facts concerning them. (See *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 590 [257 Cal.Rptr. 98, 770 P.2d 278] [duty element of negligence claim must be one "assumed by the defendant or *imposed on the defendant as a matter of law*, or that arises out of a relationship between the two" (italics added)].)

While precedent supports a state law cause of action by close family members for invasion of privacy in the circumstances here, I agree with the majority that locating such a right within the four corners of the federal Constitution is a novel proposition, not clearly established at the time of the officers' actions. I am dubious any such right exists. The Fourteenth Amendment, for example, is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States." (*Paul v. Davis* (1976) 424 U.S. 693, 697, 701 [47 L.Ed.2d 405, 96 S.Ct. 1155] [holding plaintiff could not bring 42 U.S.C. § 1983 action against police chief for distributing flyer with plaintiff's name and photograph, captioned "Active Shoplifters"].)

## A. General Observations

I agree with the majority that the allegations of plaintiffs' complaint are so unusual in the nature of defendants' alleged acts that prior California cases concerning "relational" privacy are inapposite. (See *Metter v. Los Angeles Examiner* (1939) 35 Cal.App.2d 304, 311 [95 P.2d 491] (*Metter*) [characterizing relational privacy right as "a right to be spared unhappiness through publicity concerning another person because of one's relationship to such person"].) True, those cases establish there is no general right to a fond memory of the dead, unsullied by distressing or defamatory allegations about the deceased. (See, e.g., *Flynn v. Higham* (1983) 149 Cal.App.3d 677, 679, 681–683 [197 Cal.Rptr. 145] (*Flynn*) [writings claiming actor Errol Flynn was "a homosexual and a Nazi spy" insufficient for his daughters to state claims for defamation, intentional infliction of emotional distress, or invasion of privacy].)

Nor, as other courts have explained, are survivors entitled to elevate their view of the departed over all others, thereby preventing the public from entertaining a different recollection. (See, e.g., *Schuyler v. Curtis* (1895) 147 N.Y. 434, 447 [42 N.E. 22] (*Schuyler*) [relatives unsympathetic to women's movement could not enjoin display of statue of their decedent commissioned by activists].) As the majority explains, the public may have a legitimate interest in facts about the deceased, despite the pain publication of those facts may bring to survivors. (Maj. opn. *ante*, at p. 874; see, e.g., *Metter, supra*, 35 Cal.App.2d at p. 312 [plaintiff's wife "ended her life by plunging from [a] high building. It would be difficult to imagine a more public method of self-destruction. For a brief period and in the pitiful and tragic circumstances attending her demise she became an object of public interest."].)

The privacy interest alleged here, however, is different in kind from the derivative interests asserted in earlier cases. The close connection between defendants' acts and the bodily remains that the survivors must inter makes this case unique. *Metter*, for example, is distinguishable because the defendant newspaper published a photograph of the decedent taken during her life, not her remains. (See *Metter, supra*, 35 Cal.App.2d at pp. 306–307.)

Here, central to the trial court's ruling was its conclusion the officers published no private facts about plaintiffs, but rather only about the decedent. In sustaining defendants' demurrers, the trial court relied upon the rule of law that the right of privacy "does not survive but dies with the person." (*Flynn, supra*, 149 Cal.App.3d at p. 683.) The trial court correctly concluded the details revealed in the crash scene photographs pertained to decedent because they depicted her remains. Accordingly, plaintiffs could not vicariously assert the decedent's privacy interests.

But that does not end the analysis. As explained below, plaintiffs have adequately pleaded their own personal causes of action arising from the tortious dissemination of death scene or autopsy photographs in the circumstances here. Rather than asserting vicarious rights through the decedent, plaintiffs bring their own claims that survive demurrer within the limitations inherent in privacy law.

### B. *Governing Law*

Protection of privacy through the mechanism of tort law is well established in California. In *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 231 [74 Cal.Rptr.2d 843, 955 P.2d 469] (*Shulman*), the Supreme Court explained that, "[i]nfluenced by Dean Prosser's analysis of the tort actions for invasion of privacy (Prosser, *Privacy* (1960) 48 Cal.L.Rev. 381) and the exposition of a similar analysis in the Restatement Second of Torts sections 652A–652E . . . , California courts have recognized both . . . intrusion into private places, conversations or other matters" and "public disclosure of private facts" as valid causes of action.[1] (*Shulman, supra,* 18 Cal.4th at p. 214.) In my view, the allegations of plaintiffs' complaint fit squarely within the elements of both of these torts.

#### (1) *Intrusion*

In *Shulman*, the high court noted that, "[o]f the four privacy torts identified by Prosser, the tort of intrusion into private places, conversations or matter is perhaps the one that best captures the common understanding of an 'invasion of privacy,' " and observed, "It is in the intrusion cases that invasion of privacy is most clearly seen as an affront to individual dignity." (*Shulman, supra,* 18 Cal.4th at pp. 230–231.)

As defined by the Supreme Court, "intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." (*Shulman, supra,* 18 Cal.4th at p. 231; see *Miller v. National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1482 [232 Cal.Rptr. 668] (*Miller*); Rest.2d Torts, § 652B ["One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."].) The intrusion tort is available where "the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or *data source.*" (*Shulman,* at p. 232, italics added; see Rest.2d Torts, § 652B, com. c, p. 379.)

---

[1] "The two other 'Prosser torts' are presentation of the plaintiff to the public in a false light and appropriation of image or personality." (*Shulman, supra,* 18 Cal.4th at p. 214, fn. 4.)

California law expressly provides, with limited exceptions and "[n]otwithstanding any other provision of law," that "no copy, reproduction, or facsimile of any kind shall be made of any photograph . . . of the body, or any portion of the body, of a deceased person, *taken* by or *for the coroner at the scene of death* or in the course of a post mortem examination or autopsy made by or caused to be made by the coroner . . . ." (Code Civ. Proc., § 129,[2] italics added; all further undesignated statutory references are to this code.) Plaintiffs' complaint alleged defendants Reich and O'Donnell e-mailed accident scene photographs of Nicole Catsouras's decapitated remains to numerous acquaintances. The nature of an e-mail transmission, particularly to multiple recipients, necessarily involves electronic copying of the images transmitted.

The allegations of plaintiffs' complaint reveal the accident that took Nicole Catsouras's life was exceedingly violent, sudden, and unusual because it involved sufficient force to decapitate her. Accordingly, as defendants point out, the coroner was entitled to inquire into the death. (Gov. Code, § 27491 ["It shall be the duty of the coroner to inquire into and determine the circumstances, manner, and cause of all violent, sudden or unusual deaths . . . ."].) Defendants' reliance on this code provision suggests that one of the reasons CHP officers took numerous photographs of decedent's remains was to facilitate any ensuing investigation by the coroner. The photographs, while they might also have had other law enforcement purposes such as determining whether traffic laws had been violated in the accident, appear to fall within section 129's prohibition on copying, unless an exception applies. Nothing suggests, however, that Reich's or O'Donnell's copying of the photographs in their e-mail transmissions to acquaintances served any law enforcement, medical or scientific purpose, or that they transmitted the images for use in a criminal action or proceeding relating to Catsouras's death, or pursuant to a court order. (See § 129.)

---

[2] In full, section 129 provides: "Notwithstanding any other provision of law, no copy, reproduction, or facsimile of any kind shall be made of any photograph, negative, or print, including instant photographs and video recordings, of the body, or any portion of the body, of a deceased person, taken by or for the coroner at the scene of death or in the course of a post mortem examination or autopsy made by or caused to be made by the coroner, except for use in a criminal action or proceeding in this state that relates to the death of that person, or except as a court of this state permits, by order after good cause has been shown and after written notification of the request for the court order has been served, at least five days before the order is made, upon the district attorney of the county in which the post mortem examination or autopsy has been made or caused to be made. [¶] This section shall not apply to the making of such a copy, reproduction, or facsimile for use in the field of forensic pathology, for use in medical or scientific education or research, or for use by any law enforcement agency in this or any other state or the United States. [¶] This section shall apply to any such copy, reproduction, or facsimile, and to any such photograph, negative, or print, heretofore or hereafter made."

True, plaintiffs cited section 129 nowhere in their complaint. But they adequately invoked legal protection of their privacy expectations by alleging defendants transmitted the images "to members of the general public who were not authorized and/or ever involved in any aspect of any official investigation of the October 31, 2006 vehicular collision." (See *Shulman, supra,* 18 Cal.4th at p. 235, fn. 16 [although plaintiff did not invoke Pen. Code, § 632, her claim defendant illegally recorded her conversation "is comprehended in the complaint's claim of intrusion and the substantive law relating to that claim"].)

The cloak of privacy that section 129 drapes around autopsy or death scene photographs in the situation here distinguishes *Miller,* where the appellate court concluded the decedent's daughter failed to state a cause of action for intrusion on her seclusion. The court reasoned that the decedent's wife had a reasonable expectation of privacy in her own home when, without her consent, a news crew filmed paramedics' efforts to revive her husband, but the adult daughter who no longer lived in the home did not. (*Miller, supra,* 187 Cal.App.3d at pp. 1484–1487, 1489.) Additionally, as the majority notes, it is not clear the wife's husband was dead in any of the broadcast images.

Here, in contrast, the images the officers transmitted to their acquaintances revealed without question that Catsouras was dead and, consistent with the terms of section 129, plaintiffs held an objectively reasonable expectation that the photographs would remain a nonpublic "data source" (*Shulman, supra,* 18 Cal.4th at p. 232) that CHP personnel would not transmit to others. In essence, defendants' transmission of the photographs constituted an intrusion into a matter—the photographs themselves—that plaintiffs could reasonably expect would remain undisclosed, closeted within the narrow exceptions defined by section 129. Those exceptions meant, of course, no absolute or complete privacy interest in the photographs for the decedent's survivors, and if plaintiffs held any such subjective expectation (there is no indication they did), it was not controlling. But as our Supreme Court has explained, "[P]rivacy, for purposes of the intrusion tort, is not a binary, all-or-nothing characteristic. There are degrees and nuances to societal recognition of our expectations of privacy: the fact that the privacy one expects in a given setting is not complete or absolute does not render the expectation unreasonable as a matter of law." (*Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 916 [85 Cal.Rptr.2d 909, 978 P.2d 67].)

Contrary to the trial court's conclusion, the details about decedent's corpse revealed in the accident scene photographs did not pertain *solely* to decedent or to privacy interests that expired with her. Details concerning a corpse are unlike private facts of any other kind because of the survivors' responsibility to inter the decedent's body. Society recognizes the emotional and familial

bonds underpinning survivors' direct interest in their deceased's body by conferring on them the right and obligation to dispose of the body. (Health & Saf. Code, § 7100.) The law recognizes and protects the survivors' interest in ensuring dignified treatment of their decedent's remains. (See, e.g., Health & Saf. Code, §§ 7050.5 [prohibiting desecration of buried human remains], 7051 [preventing unlawful disinterment or disturbance of human remains], 8115 [providing that local standards governing interment ensure, inter alia, "decent and respectful treatment of human remains"]; Pen. Code, § 594.35 [imposing felony punishment for interference with persons engaged in funeral services or interring human remains]; see *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 896–898 [2 Cal.Rptr.2d 79, 820 P.2d 181] (*Christensen*).)

This interest in protecting the dignity of the corpse extends beyond the dispositional rights holders to these plaintiffs, who are the decedent's close family members. (Cf. *Christensen, supra,* 54 Cal.3d at p. 896; *Quesada v. Oak Hill Improvement Co.* (1989) 213 Cal.App.3d 596, 599 [261 Cal.Rptr. 769].) And this interest bears close relation to a similarly basic interest in human dignity that underlies privacy law. (See *Shulman, supra,* 18 Cal.4th at p. 231 [a " 'measure of personal isolation and personal control over the conditions of its abandonment is of the very essence of personal freedom and dignity, [and] is part of what our culture means by these concepts' "].)

Here, as discussed, plaintiffs' complaint adequately alleged, within the confines of section 129 and for purposes of demurrer, an objectively reasonable expectation of privacy. And defendants' alleged transmission of the photographs to acquaintances, merely for shock value, satisfies the tort's second prong, namely, intrusion in a manner highly offensive to a reasonable person. I conclude plaintiffs have stated a cause of action for intrusion into private matters.

(2) *Publication of Private Facts*

The elements of the tort of public disclosure of private facts include: " '(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern.' " (*Shulman, supra,* 18 Cal.4th at p. 214; see Rest.2d Torts, § 652D ["One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that [¶] (a) would be highly offensive to a reasonable person, and [¶] (b) is not of legitimate concern to the public."].) In *Shulman,* the Supreme Court held that "lack of newsworthiness is an element of the 'private facts' tort, making newsworthiness a complete bar to common law liability." (*Shulman,* at pp. 214–215.)

Plaintiffs' allegations are sufficient to satisfy each of these elements. First, plaintiffs' complaint alleged Reich and O'Donnell disclosed the death scene photographs of Catsouras "to members of the general public . . . ." The complaint alleged the distribution was sufficiently widespread that, within a year, Web sites all over the world displayed the images, including 2,500 sites identified in the United States and other English-speaking countries such as Great Britain.

The Restatement Second of Torts defines the public disclosure element as communication to the "public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge," noting "it is not an invasion . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." (Rest.2d Torts, § 652D, com. a, p. 384; see generally Elder, Privacy Torts (2002) § 3:3, pp. 3-16 to 3-21 [criticizing stringent application of Restatement standard].) In *Kinsey v. Macur* (1980) 107 Cal.App.3d 265, 270 [165 Cal.Rptr. 608], the court concluded "the tort must be accompanied by publicity in the sense of communication to the public in general or to a large number of persons as distinguished from one individual or a few." *Kinsey* held a jilted lover's act of mailing letters to " 'perhaps twenty [people] at most' " to " 'tell the whole world what a bastard [plaintiff] is' " constituted the requisite publicity. (*Id.* at pp. 271–272.) Plaintiffs did not specify any number of persons to whom Reich or O'Donnell directly e-mailed the photographs. But the medium in which defendant chose to make the disclosure is important, since e-mail is so susceptible to easy and thoughtless forwarding to a larger audience. Given the medium the officers selected and the likelihood acquaintances they chose would, like the officers, prove unable to resist an impulse to forward the photographs, plaintiffs' allegation that defendants publicized the photographs to "members of the general public" is sufficient to survive demurrer, even under a standard requiring disclosure substantially certain to become public knowledge.

Second, the facts revealed in the death scene photographs of Catsouras's decapitated remains were private as to these plaintiffs in several respects. They were private because, as discussed, section 129 prohibited public dissemination of the photographs, supporting an objectively reasonable expectation of family members the photographs would not become the subject of electronic gawking. Plaintiffs and defendants disputed in the pleadings whether plaintiffs had a property right in the photographs or other depictions of their decedent's body, but property law does not always define privacy's bounds. (See *Shulman, supra,* 18 Cal.4th at p. 232.) Rather, the question is one of objectively reasonable or unreasonable expectations. (*Id.* at pp. 232–234 [reversing summary judgment where triable issues existed on plaintiff's expectation of privacy in conversations with airlift medic].) Section

129 supports the conclusion plaintiffs held an objectively reasonable expectation of privacy in the circumstances here. (Cf. *Shulman*, at p. 235 [plaintiff's "claim, of course, does not require her to prove a statutory violation, only to prove that she had an objectively reasonable expectation of privacy"].)

The facts revealed in the photographs were also private because, as discussed above, survivors have a privacy interest in the body—and in facts about the body—that they must inter. Crucially, the photographs disseminated by Reich and O'Donnell revealed intimate, gruesome facts about Catsouras's lifeless body that were not public knowledge. The "[p]laintiff in a public disclosure case has the burden of proving as a 'threshold' requirement . . . that the 'facts exposed were kept hidden from the public eye.' In other words, [the] plaintiff has no 'objectively reasonable expectation of privacy' in matters in the 'public domain' and [the] defendant is 'subject to no liability for giving further publicity to what the plaintiff himself leaves open to the public eye.' " (Elder, Privacy Torts, *supra*, § 3:5, pp. 3-43 to 3-45, fns. omitted; see *Sipple v. Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1047 [201 Cal.Rptr. 665] (*Sipple*) ["a crucial ingredient of the tort premised upon invasion of one's privacy is a public disclosure of *private facts* [citations], that is, the unwarranted publication of intimate details of one's private life which are outside the realm of legitimate public interest . . ."].)

Jurisdictions addressing the issue have found a familial right of privacy in autopsy photographs. "Courts that have found an invasion of privacy have done so when the case involves death-scene images such as crime scene or autopsy photographs." (Calvert, *Support Our [Dead] Troops: Sacrificing Political Expression Rights for Familial Control over Names and Likenesses* (2008) 16 Wm. & Mary Bill Rts. J. 1169, 1181; see *Reid v. Pierce County* (1998) 136 Wn.2d 195 [961 P.2d 333, 342] [family members stated invasion of privacy cause of action where defendants displayed, in handmade scrapbooks circulated at a cocktail party, decedents' autopsy photographs]; *Adams v. King County* (2008) 164 Wn.2d 640 [192 P.3d 891, 902] [mother had privacy interest in deceased son's autopsy records, but no actual disclosure occurred]; *Katz v. National Archives & Records Admin.* (D.D.C. 1994) 862 F.Supp. 476, 485–486, affd. (D.C. Cir. 1995) 68 F.3d 1438 [access to autopsy photographs of John Fitzgerald Kennedy would be a "clearly unwarranted" invasion of family's privacy]; *Badhwar v. U.S. Dept. of Air Force* (D.C. Cir. 1987) 829 F.2d 182, 185–186 [families of deceased pilots had protectable privacy interest in autopsy reports]; cf. *Loft v. Fuller* (Fla.Dist.Ct.App. 1981) 408 So.2d 619, 624–625 [refusing to adopt "blanket rule" prohibiting relational privacy claims, recognizing in dicta "sufficiently egregious" claims, such as "display[ing] grotesque pictures of the deceased's body," but finding standard not met there in defendant's reports of decedent's reappearance as a ghost].) The majority ably demonstrates the high court has

recognized a familial right of privacy in death scene photographs based on a long-standing common law and cultural traditions respecting family interests.[3] (*National Archives and Records Admin. v. Favish* (2004) 541 U.S. 157 [158 L.Ed.2d 319, 124 S.Ct. 1570].) There is scant contrary authority directly on point.[4]

Third, on these facts it hardly needs stating plaintiffs met their pleading burden to show defendants' publication of the private facts contained in the photographs would be offensive and objectionable to a person of ordinary sensibilities. "[D]etermining offensiveness requires consideration of all the circumstances of the intrusion, including its degree and setting and the intruder's 'motives and objectives.' " (*Shulman, supra*, 18 Cal.4th at p. 236.) At this pleading stage, plaintiffs have satisfied the third element of the public disclosure tort: a reasonable person would find defendants' disclosure of these photographs to be offensive and objectionable.

Fourth, plaintiffs' complaint satisfied their initial pleading burden to demonstrate the absence of any legitimate public concern or newsworthiness in the exposure of graphic and private details published by the defendants. Legitimate public concern and newsworthiness do not comprise separate elements, but rather are interrelated and involve assessing "the social value of the published facts . . . ." (*M. G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623, 631 [107 Cal.Rptr.2d 504].)

Here, it is true decedent's decapitation was public knowledge as a result of news reports and, moreover, this fact was newsworthy to illustrate the severity of an automobile accident occurring on a public highway. (See *Sipple, supra*, 154 Cal.App.3d at p. 1047 ["there can be no privacy with respect to a matter which is already public [citation] or which has previously become part

---

[3] And as Aeschylus memorably demonstrated, Antigone's motivation to bury her brother's body arose from her emotional ties and her sense of familial obligation, loyalty and affection-bonds that are recognized by all civilized societies.

[4] *Waters v. Fleetwood* (1956) 212 Ga. 161 [91 S.E.2d 344], acknowledged by the majority as contrary precedent for a relational right of privacy in death images, is distinguishable for three reasons. First, it did not involve autopsy photographs or death scene photographs taken for a coroner's investigation; second, press photographers were not excluded by police from the scene where the child murder victim's remains were removed from a river; and third, the state of the victim's remains, including the chains about her decomposed body, may have been newsworthy in illustrating the manner and time of the killing, of legitimate interest to the public. (But see *State v. Rolling* (Fla.Cir.Ct. 1994) 22 Media L.Rep. 2264 [1994 WL 722891] [trial court balanced public interest in Gainesville murders with family privacy interests by allowing public to view photographs at courthouse, but prohibiting their removal or publication]; *Campus Communications, Inc. v. Earnhardt* (Fla.Dist.Ct.App. 2002) 821 So.2d 388 [court allowed parties interested in ensuring race car safety to inspect autopsy photographs of deceased driver, but prevented release or publication of photos to protect family privacy].) None of the factors distinguishing *Waters* are present here to thwart the protection of California privacy law.

of the 'public domain . . .' "].) That an accident occurs on a public highway, however, does not make every detail connected to the accident "public" or of overriding public interest. (*Shulman, supra,* 18 Cal.4th at pp. 233–234.) Plaintiffs' allegation in the complaint that CHP officers "cordoned off the area, and took control and custody of the area of the traffic collision and everything within it, including the remains of Decedent," while also excluding others, including decedent's father, is sufficient on demurrer to withstand defendants' claim that "decedent's remains . . . were on a public highway *in public view*." (Italics added.) (See *Shulman*, at p. 233, fn. 13 [no record evidence supported assertion a " 'crowd of onlookers peer[ed] down at the rescue scene . . .' "].)

Moreover, contrary to defendants' argument that general public knowledge of the decapitation thwarts plaintiffs' claims, certain graphic facts revealed in the photographs had not been made public and defendants identify no legitimate public interest in those facts. Specifically, for example, the expression frozen on the decedent's face following her death, the exact location and position in relation to each other in which the different parts of decedent's remains came to rest, and the gore of her particular wounds revealed in detail by the photographs were neither in the public domain, nor served any public purpose.

There appears to be no social value in the defendants' allegedly unprivileged dissemination of the accident scene photographs and the private facts those photographs revealed. The lack of newsworthiness in these particular facts distinguishes defendants' contention that allowing plaintiffs' claims to proceed past the demurrer stage would chill publication of historically newsworthy photographs, such as Civil War battleground photographs and pictures of other war dead. To the contrary, for demurrer purposes, plaintiffs have established the absence of any legitimate public interest in the details the officers revealed in the photographs. Consequently, I agree with the majority that plaintiffs have stated a cause of action for invasion of their privacy by publication of private facts.

## C. Conclusion

The essence of privacy law is that it guards objectively reasonable expectations of privacy society recognizes as legitimate. While until today no California case had yet recognized a familial right to privacy in autopsy or similar photographs, I conclude it is no great leap to do so. Significantly, California law already expressly provides, with limited exceptions and "[n]otwithstanding any other provision of law," that "no copy, reproduction, or facsimile of any kind shall be made of any photograph . . . of the body, or any portion of the body, of a deceased person, *taken by or for the coroner at*

*the scene of death* or in the course of a post mortem examination or autopsy made by or caused to be made by the coroner . . . ." (§ 129, italics added.) The interests protected by this provision naturally include the survivors' privacy interest in preventing dissemination of gruesome autopsy and death scene photographs of their loved one. As detailed above, within the constraints of section 129 and subject to the competing interests balanced by the principles of California privacy law, I conclude plaintiffs have stated a cause of action for invasion of their own privacy, not their decedent's. (See, e.g., *Schuyler, supra*, 147 N.Y. at p. 447 ["it is the right of the living and not the dead is recognized"].)

A petition for a rehearing was denied March 1, 2010, and the opinion was modified to read as printed above. The petition of respondents Aaron Reich and Thomas O'Donnell for review by the Supreme Court was denied April 14, 2010, S180881. George, C. J., did not participate therein.